Millard L. Midonick, S.
This proceeding concerns the petition of the Spence-Chapin Adoption Service for commitment of a minor, “Male” L. to the custody of the SpenceChapin Adoption Service under section 384 of the Social Services Law. Petitioner commenced this proceeding on December 1, 1972. The natural mother of the infant was served and defaults in this proceeding. The natural father was also named as a respondent at the direction of the court and was served with citation on February 6, 1973. In compliance with Stanley v Illinois (405 US 645), a hearing was held on December 11, 1974 and several months were required for the submission of briefs. Under Stanley v Illinois (supra), an unwed *347 father’s right to custody of his child cannot be terminated without the hearing requirements of due process of law. Stanley, in fact, involved an unwed father who had raised his children in his own home.
Here, the natural father, who lived out of wedlock with the natural mother for four months prior to the birth of this boy, has moved to dismiss the petition of the Spence-Chapin Adoption Service, on the ground that the petitioner failed to prove or plead that respondent father abandoned his infant son. The child was born out of wedlock on October 27,1967 and 10 days after his birth, the natural mother voluntarily placed the child with the Commissioner of Social Services of the City of New York for temporary foster care. The father’s name does not appear on the birth certificate. The infant has remained in foster care with the same foster parents from November 1967 to this date. The infant believes that his foster family is his only family and has no knowledge or recall of his natural parents. At the time of the birth of this infant, respondent father was married to a woman other than the mother of this infant. In February, 1968, respondent acknowledged paternity and agreed in writing that he would support his child. However, respondent’s salary has been insufficient to cover any support for many years and, in any event, he has made no such payments. The natural mother never contributed towards support. The court finds this long-term failure of support as evidence of abandonment as defined by section 371 of the Social Services Law: " 'Abandoned child’ means a child who is abandoned or deserted in any place by both parents * * * and left * * * (c) without being visited or having payments made toward his support, for a period of at least six months, by his parent, guardian or other lawful custodian without good reason”.
The child never lived in the home of the natural parents, although the father claims that he objected to the natural mother’s refusal to bring the baby home. Curiously, respondent could not recall whether or not the natural mother actually resided with him after the birth. Respondent also testified that he did not inquire as to the whereabouts of the baby, although he claims to have visited the mother in the hospital during her confinement. In July, 1968, the agency interviewed the father and, upon his insistence, permitted him to visit the child twice; once he was accompanied by the natural mother. Agency records of 1968 reflect that the father *348 was desirous of custody of his child but that he had no plans or means to accomplish this purpose. In 1968, the agency therefore determined on a plan for adoption.
Nevertheless, respondent continued regularly visiting the child between August, 1968 and August, 1969. Respondent testified that during these visits, the infant appeared confused and cried when removed from the arms of the foster parents. These visits also revealed, as the father testified, a close and warm relationship between the infant and the foster parents. Between 1968 and 1970, the natural mother made sporadic visits with the child. The court recognizes that the agency was operating under pre-Stanley v Illinois concepts amounting to the absence of rights of fathers of out-of-wedlock children. Therefore, the agency dealt only with the natural mother, as the sole party with parental rights. The natural mother’s consent was thought necessary in order for the father to visit the infant. In 1970, the agency lost contact with the mother but later discovered that the natural mother had returned to her parents’ home in the Midwest and that the natural mother and father were no longer living together.
At the end of 1971, the agency determined that the best interests of the child outweighed the father’s desire to visit the child and informed the father that the courtroom was the proper place to determine if the natural father had the right to further visitation with the child. Respondent father was told by petitioner to obtain an attorney if he sought to resume visits with the child. However, the father remained silent thereafter and never sought to enforce his legal rights except to appear as objectant to this proceeding brought by petitioner in 1972.
Respondent argues that petitioner never recognized the rights of the natural father enunciated in Stanley. This court has determined that prior to 1972, the petitioning agency acted in legally acceptable pre-Stanley fashion: with respect to children born out of wedlock, rights and responsibilities belonged to the natural mother and did not belong to the natural father. Only since 1972, when Stanley had been decided, did problems arise about the natural father’s right to block a commitment, adoption or placement with an agency for temporary foster care. The legal mistake of the agency, prior to 1972, under the novel Stanley doctrine, does not give the natural father an absolute right to custody of his child. Surrogate Regan commented on the necessity of the father’s *349 consent to an adoption, which is not dissimilar to a commitment for the purpose of adoption. The Surrogate held that the mother’s exclusive and sole consent to the adoption of a child born out of wedlock suffices only when there has been no formal or unequivocal acknowledgement or recognition of paternity by the father: "This court holds that it is not that the father’s 'consent’ is now necessary as a condition precedent to adoption, but, rather that he be served with 'notice’ and given an opportunity to present facts for the court’s consideration to determine what is 'in the best interest of the child.’ ” (Matter of Anonymous, 78 Misc 2d 1037, 1039-1040.)
In October of 1972, two months before this proceeding was initiated by petitioner, respondent appeared at the agency and sought visitation. Again the agency prevented the father from visiting his child on the grounds that the natural mother allegedly did not want the natural father to visit the child. Other grounds are more persuasive. If the unwed father has the right only to a hearing to determine the best interests of the child, then this father’s consent need not be a condition for commitment and this proceeding is not rendered defective because of this attempted visitation. Since our statute speaks only of "abandonment”, a literal interpretation of it may collide with the infant’s constitutional right to a stable home unimpaired by the father’s objection to this commitment application. And so, the statutory "abandonment” may be interpreted in a way that protects the infant’s constitutional rights. If, on the other hand, this unwed father has the same right to withhold his consent as the right of a married father, then by the very same reasoning he may be barred because the welfare of his then five-year-old child by that time would have been disserved by permitting a stranger to him to upset the stable home of the child from birth after years of nonvisitation and nonsupport by the father. The mistake of law for several years by the agency, before Stanley and before this attempted visitation, does not detract from this child’s constitutional right to a stable and permanent home. A lapse of one and one-half years (March, 1971 to October, 1972) between the last visitation and the last attempt to visit, under these circumstances, supports the agency’s decision that resumption of visitation would be detrimental to the welfare of this child. (Matter of Jennifer "S. ”, 69 Misc 2d 942, 951; Social Services Law, § 384, subd 1, pars [b], [c]; cf. Family Ct. Act, §§ 611, 614.) The mistake of law by the agency is no different from the *350 mistake of fact by the agencies in Jennifer "S.” (supra); the child must not be prejudiced by such mistakes. The court therefore finds that this attempt to visit by respondent within the six-month period preceding commencement of this proceeding does not disprove "abandonment” within the meaning of section 384 (subd 1, pars [b], [c]) of the Social Services Law. If fault is to be found, some must be laid at the door of respondent who never sought legal representation as an indigent or otherwise, to enforce visitation, although he was advised to do so by petitioner; only after commencement of this proceeding, did the natural father retain counsel.
Respondent attempts to analogize his situation to that of the unwed father in Rothstein v Lutheran Social Servs. (59 Wis 2d 1, on remand from 405 US 1051). The out-of-wedlock child there involved was born in the year after the one involved here. There the father brought his habeas corpus writ and has twice completed appeals in the highest court of Wisconsin and once in the Supreme Court of the United States. Here, the father languidly slept on his rights to legal redress and is only now finishing his due process hearing in a commitment of his child who is older than the Rothstein child. Here, the father has had a full due process hearing; in Rothstein he did not.
The situation in Stanley cannot be compared with the matter now before the court. In Stanley, the natural father, unlike the respondent, had raised his children, and had created a viable family unit. The natural father here did not ever live with his child and has not performed any of the responsibilities, such as child rearing and supporting one’s child, characteristically associated with fatherhood. Thus, it does not follow that respondent, without bearing the responsibilities of fatherhood would still have the rights of the natural father beyond the right to a hearing focused on the welfare of the child.
The court recognizes that this father never intended to give up his rights to be the father of the child. The Supreme Court in Rothstein remanded the case to the Supreme Court of Wisconsin for further consideration in light of Stanley "with due consideration for * * * the fact that the child has apparently lived with the adoptive family for the intervening period of time.” The court has fully considered the length of time that this child has spent with the same foster family and finds that the warm and loving relationship recognized by all *351 parties, between the infant and his foster family with whom he has lived so long, is so important to this child that it becomes inimical to the welfare of this child to try to strengthen the natural parent-child relationship. Thus, the possibility that respondent could now care for the infant in his own home, when for such a long time he could not do so, does not justify establishment of the parent-child relationship.
The father’s consent to this commitment is dispensed with, since he is found to have abandoned his child and was a parent unable to care for this child for several years. The relief requested by petitioner is granted.