IN THE MATTER OF THE ADOPTION OF THE INFANT MALE[1]

[No. 3-1177A285. Filed July 27, 1978.]

*Jeffrey G. Raff, Dean A. Brown*, of Fort Wayne, for appellants.

*William C. Lee*, of Fort Wayne, for appellee.

STATON, J.—Adoptive parents petitioned to adopt the infant male son of the natural mother, D.M. D.M. had signed a consent to the adoption while she was still in the hospital after the birth of the infant. In the

---

1. The caption and the names in the opinion have been changed to protect the adopted child.

course of the adoption proceedings, R.M., D.M.'s ex-husband, appeared as respondent. R.M. asked that the petition for adoption be denied, that he be found to be the natural father of the child, and that he be granted custody. The trial court granted the adoption petition which has been filed by the adoptive parents.

R.M. appeals. He raises two issues for review by this Court:

(1) Did the trial court err in finding that the natural father of the infant male is unknown?

(2) Did the trial court err in failing to find that the natural father's consent is a necessary pre-requisite to the adoption of an out-of-wedlock child?

We find no reversible error. The judgment of the trial court is affirmed.

## I.

### Factual Controversy

Our enquiry within this appeal is a narrow one: where the facts without conflict regarding the paternity of the infant child, and do those facts lead inexorably to the conclusion that R.M. is the natural father of the child? We have reviewed the record. We glean these pertinent facts.

After R.M. and D.M. were divorced, they again cohabited for a time. It was during the period they were living together that the infant male M. was conceived. R.M., however, did not at any time formally acknowledge that the unborn child was his. D.M. attempted to make provisions for caring for the unborn child, but she had no income. D.M. and R.M. ceased their cohabitation, and D.M. moved in with her parents. D.M. had custody of another child who had been born to D.M. and R.M. during their marriage.

D.M.'s parents were unsupportive of her wishes to raise the child. D.M. attempted to obtain welfare support, but she was turned down. She filed a paternity action against R.M., but he did not admit that he was the natural father of the unborn child and instead demanded that blood tests be made after the child was born. During the pendency of the paternity action, R.M. filed a petition to modify his divorce decree so that his visitation would be increased with the child that had been born during his marriage to D.M. His petition to modify also requested in the alternative that he be awarded the custody of the child.

D.M. spoke with her physician about her problems and indicated to him that she wished to place the unborn child for adoption. She stressed to him that she wanted the child to go directly to the adoptive parents rather than to an agency or a foster home. D.M.'s physician told her that he had a patient who was unable to have children. The physician placed both D.M. and the prospective adoptive parents in touch with an attorney. The attorney testified during the adoption proceedings that D.M. told him that the putative father's name was C.G. D.M. testified that she felt the adoption was in the best interests of the unborn child. Social workers testified that they believed that D.M. was doing a very positive thing in placing the child. A handwritten note was admitted at the hearing; the note was from D.M. to the adoptive parents, and it expressed D.M.'s love for the child and wishes for its future.

The adoptive parents were aware that the putative father of the child would have to be notified before the adoption could become finalized. Notices were published to C.G. A co-worker of R.M. pointed out the newspaper notice which was captioned IN THE MATTER OF THE ADOPTION OF INFANT MALE [      ]. The department of welfare was notified of the initial hearing on waiving the requirement of prior written approval by a child placing agency. The welfare department then contacted the judge and notified him that welfare department records showed the putative father to be R.M. R.M. was issued notice, and he participated in the adoption proceedings. C.G. did not appear.

At no time during the gestation of the child or after the child's birth did R.M. assume responsibility for support or did he pay medical expenses. R.M. cursed at D.M. whenever she would call him regarding the impending birth of the child. He did not formally inquire about the child until after the adoption proceedings were well under way. The paternity action filed by D.M. was dismissed for lack of prosecution.

## II.

### Natural Father

The trial judge found that the natural father of the child is unknown; the court also found specifically that R.M. had at no time in the paternity action filed by D.M. admitted his paternity, and that the paternity of the child has not been established by a court proceeding. R.M.'s argu-

ment on appeal is, in essence, a plea that we re-weigh the evidence. He insists that the evidence conclusively establishes that he is the natural father of the infant male.

We disagree. R.M.'s actions prior to the birth of the child, his implicit denial in D.M.'s paternity suit, his failure to offer monetary or emotional support for the child, and his attitude of hostility to D.M. (calling her such names as "slut" or "whore") belie his assertions that paternity was clearly established (even in his own mind). Moreover, the attorney who initially handled the adoption stated that D.M. gave C.G. as the name of the putative father. The attorney's notes of his conference with D.M. reflect that same name along with a physical description. Certainly the evidence was in some conflict. It was the function of the trial court to determine the credibility of witnesses and weigh the evidence. This Court will not assume that function. *L.F.R. v. R.A.R.* (1977), 175 Ind.App. 172, 370 N.E.2d 936. When a judgment is attacked as being contrary to law, this Court will consider only the evidence supportive of the judgment and the reasonable inferences to be drawn therefrom. *Blakenship v. Huesman* (1977), 173 Ind.App. 98, 362 N.E.2d 850. No presumption of legitimacy was extant in these circumstances. R.M. sought to have paternity established. His was the affirmative burden. He cannot now complain that the adoptive parents failed to prove a negative. This Court will not impose such a difficult task. *L.F.R. v. R.A.R., supra.* The trial court determined the credibility of the witnesses and weighed the evidence. We shall not repeat the process. *B & T Distributors, Inc. v. Riehle* (1977), 266 Ind. 646, 366 N.E.2d 178.

## III.

### Consent

Due to our resolution of the paternity issue, R.M.'s argument regarding the natural father's consent loses some of its importance. It cannot be said that the trial court erred in failing to obtain R.M.'s consent before the adoption was granted since he was not adjudicated to be the natural father.

However, we must agree that had paternity been established in R.M., he would likely have acquired a veto authority. *See Quilloin v. Walcott*

(1978), 434 U.S. 246, 98 S.Ct. 549. This is not a situation of inadequate notice, *Stanley v. Illinois* (1972), 405 U.S. 645, because R.M. participated fully in all of the proceedings. The implication within *Quilloin v. Walcott* (1978), 434 U.S. 246, 98 S.Ct. 549, is that the natural father need not have been *adjudicated prior* to the adoption proceedings in order to obtain a parental right to veto an adoption. The putative father theoretically could raise the legal issue of paternity in the same manner that R.M. has raised the issue in this case: as a respondent within the adoption proceeding. But, this does not force a conclusion that paternity *will* be settled in that putative father.

The evidence regarding the natural father of the infant male was in conflict. The trial court did not abuse its discretion in granting the petition for adoption. We affirm.

Hoffman, J. concurs;

Robertson, J. (by designation), concurs.

NOTE—Reported at 378 N.E.2d 885.