UNWED FATHER V. UNWED MOTHER

[No. 3-277A58. Filed August 14, 1978.]

238

*Patrick E. Donoghue,* of Michigan City, for appellant.

*Michael Brennan,* of Michigan City, for appellee.

STATON, J. — Unwed Father (Father) initiated this action in order to obtain judicial protection of his parental rights and to determine his parental responsibilities. Father is the natural father of a child born to Unwed Mother (Mother). The trial court concluded that Father is the father of the child, but, paternity notwithstanding, denied Father's suit for custody. The court also awarded Mother damages on her counterclaim.

Father appeals. We reverse.

## I.

### Unwed Mother's Rights

Father and Mother were students in Minnesota when the child was conceived. Neither party considered marriage. Mother did consider abortion, but she rejected that alternative. Mother favored placing the child for adoption, but she particularly desired anonymity of the adoptive parents. Father maintained that if Mother placed the child for adoption he wanted the child. Mother was adamantly opposed to any relationship between Father and the child.

Approximately two weeks before the birth of the child, Mother moved, leaving no forwarding address. She gave birth to a girl on July 2, 1976, somewhere outside of the State of Indiana. On July 12, 1976, Father

wrote to Mother and to her father at his Michigan City, Indiana, address, and tendered a guaranty of payment for all medical expenses, again expressing his interest in the child, and requesting information regarding the child's birth. At that time, Father did not know that the child had already been born.

On July 26, 1976, Father began a series of legal proceedings in which he attempted to assert parental rights over the child. We shall not burden this opinion with each of Father's motions. It is sufficient to note that, beginning with his petition for a writ of habeas corpus on July 26, 1976, and culminating in the court's November 3, 1976, ruling, Father demonstrated diligence in seeking an adjudication of his parental rights. From the birth of the child on July 2, 1976, to the judgment on November 3, 1976, a little over four months elapsed.

## A. Mother's Rights During Pregnancy.

Mother and Father discussed the pregnancy many times. Abortion and adoption were discussed. Although Father was opposed to the idea of abortion, when Mother made an appointment to secure an abortion, Father provided money for her. Mother favored adoption, but Father resisted, insisting that he wanted his biological child. Mother participated in a counseling program for unwed mothers, and Father attended at least one session with her. When Mother was told by the clinic that the putative father would have to consent to an adoption, Mother became very upset.

Father testified that, understanding what Mother was going through, he finally told her that he would sign a consent to adoption. He stated at trial that he verbally agreed because he wanted to ease Mother's anguish. He reasoned that Mother was upset at the prospect of knowing where her child was (i.e., with Father); he intended to adopt the child himself and not tell Mother.

In April, 1976, Father told Mother that he did not intend to consent to the adoption. Mother was now beyond the point in her pregnancy where in an abortion was an alternative. She knew that once she had the child, Father's consent was legally necessary. She decided to leave and not inform Father of the birth of the child.

The judgment of the trial court reveals the following pertinent circumstances:

"After confirming her pregnancy on November 8, 1975, defendant's [Mother's] first impulse was to have an abortion performed. Plaintiff [Father] never denied defendant this choice. It was only after defendant felt it more acceptable to [sic] morally to give birth to the child and then place it for adoption that differences arose between the parties. Defendant felt neither she nor plaintiff were equipped to raise the child. Plaintiff took the position he would prefer to take the child rather than consent to its adoption. Numerous discussions and arguments followed between the parties, frequently charged with emotion. Incomplete understandings were reached to be followed by vacillations and repudiations.

On December 5, 1975, parties met with a counselor from a private agency, whose purpose was to provide alternatives to abortions, and plaintiff advised the counselor that he would not provide the proper consent for adoption. Defendant had met with this counselor previously and had remained in contact with her until she left St. Paul on June 22, 1976.

Between December 5 and December 9, arguments between the parties intensified, and on December 8, defendant arranged for an abortion the following day, and plaintiff provided her with the required abortion clinic charges. December 9th was preceded by a long and emotional discussion between the parties wherein plaintiff agreed to consent to an adoption. Nevertheless, defendant proceeded to the clinic, discussed the abortion with a counselor, and returned home without having the procedure.

Conflicting testimony was presented in regard to the several conditions attached to plaintiff's agreement to give his written consent to the adoption. However, based on all of the testimony and evidence presented, the Court resolves the same in favor of the defendant and that a promise of the consent to adoption was given by plaintiff to defendant.

Thereafter, the parties met only once, in January of 1976, when the subject of defendant's pregnancy was avoided. By February 1, 1976, defendant have moved from plaintiff's building and had previously changed colleges. No contact was made between the parties until April 25, 1976. On that date, plaintiff informed defendant that he would not consent to an adoption, and for that matter, he had never intended to give such consent. Plaintiff's reasoning for this revelation provides some interesting observations.

Finally, the parties were placed in juxtaposition as to their respective rights regarding abortion and adoption under the laws of Minnesota. Defendant had an absolute right to an abortion during the first three months of pregnancy and under certain conditions, the period could extend up to six months. Defendant was now almost seven months pregnant. Plaintiff's consent to adoption would not be required until after the birth of the child. Clearly, on April 25, 1976, it was no longer legal or safe for defendant to have an abortion performed while plaintiff's right would not accrue until July 2, 1976.

The only remaining question before the court is whether plaintiff conducted himself in such a manner, and whether the defendant so relied upon plaintiff's conduct that he may now be estopped from asserting his parental rights regarding the child. The court finds that estoppel does exist, and it is its judgment that plaintiff is estopped from asserting his parental rights. Accordingly, plaintiff's petitions for writ of habeas corpus and for the appointment of a guardian ad litem are denied. The court further assesses damages for the defendant and against the plaintiff in the sum of $3,000.00."

A woman's rights to control the disposition of her unborn child have been discussed at length by the United States Supreme Court. In *Roe v. Wade* (1973), 410 U.S. 113, the Court held that the right of privacy "is broad enough to encompass a woman's decision whether or not to terminate her pregnancy." *Id.* at 153. *Roe v. Wade, supra,* then prescribed boundaries for the exercise of that right; the boundaries related to the three trimesters of pregnancy and the viability of the child. In *Planned Parenthood v. Danforth* (1976), 428 U.S. 52, it was held that spousal or parental consent was not required before a woman could procure an abortion.

Father has not disputed Mother's legal prerogative to abort. In fact, recognizing that he had no right to prohibit such an abortion, Father provided the necessary money to pay for the abortion. Mother complains, though, that she relied upon Father's promise to consent to the adoption, and that she did not go through with her intention to abort because of her reliance. The trial court accepted her argument and thereafter found that Father was "estopped" to assert any parental rights.

Mother has refused throughout the litigation to disclose the whereabouts of the child. In fact, she refused to disclose in what state

the birth, or the giving up for adoption, took place. She has only stated that the child was not born in Indiana or Minnesota. Therefore, we are handicapped in executing a precise analysis of the problem. Adoptions are statutory in nature, and the legislative requirements control.

It is a general rule, however, that written consent to the adoption must be obtained from the mother of an illegitimate minor child and the father of such child whose paternity has been established by a court proceeding and who has contributed to the support or care of such child. See IC 1971, 31-3-1-6(a)(2), Ind.Ann.Stat.§3-120 (Burns Code Ed.). The consent is to be executed after the birth of the child. See IC 1971, 31-3-1-6(b), Ind.Ann.Stat. §3-120 (Burns Code Ed.). It is obvious, then, that Father could not have consented to the adoption of the child before the child was born. The trial court specifically recognized the fact that Father's rights did not accrue until after the child was born. However, the court did find that Father had promised to consent and that the breach of that promise to consent created an estoppel against Father for the assertion of his now-accrued parental rights.

We disagree. A consent to adoption is only a portion of the legal adoption proceeding. It has no legal significance outside of that proceeding. If the consent is written, it satisfies a statutory prerequisite for the *institution* of an adoption proceeding. It signifies an *intent* to allow the adoption to take place. Father's promise to Mother was verbal. Mother herself would not have been held to a written (let alone verbal) intent, made six months prior to the birth of the child, to give the child up for adoption. We see no reason, legal or moral, to treat Father's statement as binding.

Mother's argument that she forwent an abortion is irrelevant. In addition to the factual record, which clearly demonstrates that Mother never did morally want an abortion, this Court notes that we are not now dealing with an embryo. A child was born. It is the welfare of the child which demands our attention.

*B. Mother's Rights Now.*

Father instituted this litigation in order to assert his parental rights.

Mother's actions have been directed toward "protecting" the child from any association with Father. In this regard, she has refused to disclose any information which could lead Father to the child. She has sought the protection of Indiana Rules of Procedure, Trial Rule 26(C), and she pled the Fifth Amendment when cross-examined at trial. The trial court tolerated her secrecy. In fact, during an *in camera* proceeding, Mother refused to disclose, even to the judge, any pertinent facts regarding the child.

The trial court, by impeding the discovery process in allowing Mother's silence, erred. There are absolutely no facts of record which would substantiate the granting of the motion for a protective order. Mother was not being harassed; the interrogatories served by Father were brief and purposeful. Furthermore, we can conceive of no substantiation for Mother's reliance upon the Fifth Amendment of the United States Constitution. The provision states that no person "shall be compelled in any criminal case to be a witness against himself." No criminal case was ongoing, nor do the facts reveal any prospect of criminal action against Mother.

The discovery process is crucial to the efficient administration of justice. When access to the facts is denied, on a unilateral basis, by one party to the litigation, justice is not served. The necessity for compliance with full discovery is recognized by Indiana Rules of Procedure, Trial Rule 37. This rule details three sanctions to be utilized in enforcing discovery proceedings: contempt, damages, and default. Upon remand, Mother should be ordered to comply with Father's reasonable discovery efforts. Should she fail to do so, or should she be dilatory, the trial court has a duty to sanction her.

## II.

### Unwed Father's Rights

Mother has maintained that she, as the mother of the child, had the right to decide what was in the best interests of the child. The trial court based its decision upon the estoppel argument, discussed herein. However, in its judgment, the court implicitly did recognize that Father possessed parental rights.

The United States Supreme Court has recently discussed the rights of the unwed father. In *Quilloin v. Walcott* (1978), 434 U.S. 246, 98 S.Ct. 549, that Court considered whether an unwed father need consent to an adoption, or whether the adoption can take place with only the mother's consent. Two facets of that opinion are important.

First, the Court reemphasized the necessity for notice to and participation of the putative father in an adoption proceeding. Father not only did not receive notice, but despite his diligent efforts, was prevented from discovering where that proceeding would take place so that he could participate. The right of the natural father to participate in the adoption hearing has been recognized since *Stanley v. Illinois* (1972), 405 U.S. 645.

Second, the Court stated that where an unwed father has been granted legitimation, he acquires a veto authority over the adoption. *See also In the Matter of the Adoption of the Infant Male* (1978), 177 Ind.App. 138, 378 N.E. 2d 885. Here, Father was adjudged to be the father of the child.

Given these circumstances, we hold that Father should have an opportunity to participate in a hearing on the adoption. We recognize that the United States Supreme Court in *Quilloin v. Walcott, supra,* spoke in terms of the natural father's veto authority. However, we are also cognizant that that same Court, in that same opinion, carefully considered the "best interests of the child" standard.

## III.

### Child's Rights

Father has been consistent in his efforts to obtain information about and custody of his natural child. However, despite his diligence, the child is now more than two years old; moreover, he has never seen the child, and he has not had any opportunity to develop a parental relationship with the child. We recognize explicitly that Father's lack of support is not his fault. The record is replete with his attempts to provide monetary help for Mother. From the beginning, he acknowledged his responsibilities and has attempted to shoulder them. He has been thwarted by the actions of Mother.

Unfortunately, the best interest of the child in this case may have also been thwarted. In Indiana, the best interest of the child is the trial

court's paramount concern in an adoption proceeding. *See* IC 1971, 31-3-1-7(c), Ind.Ann.Stat. §3-120a (Burns Code Ed.); *In Re Adoption of Dove* (1977), 174 Ind.App. 464, 368 N.E.2d 6. A few weeks or a few months after the birth of the child, a placement of the child with Father would not have been necessarily traumatic. However, after two years of enjoying the stability of a two-parent home, the prospect of uprooting the child appears to be undesirable. After two years, strong emotional bonds will have formed between the child and her adoptive parents.[1]

A due respect for the best interests of the child must pervade any future action regarding this infant. As was stated in *In Re Guardianships of Morgan* (1972), 70 Misc. 2d 1063, 335 N.Y.S.2d 226, 230, "Children, too, have constitutional rights that must be considered and protected." Another New York court considered the ramifications of an unwed father's veto over adoptions. There, the unwed father had *attempted* to visit with his child, but he was hindered by the adoption agency. The fact that the agency was wrong, however, does not give the natural father an absolute right to custody, reasoned the court.

> "Since our statute speaks only of 'abandonment', a literal interpretation of it may collide with the infant's constitutional right to a stable home unimpaired by the father's objection to this commitment application. And so, the statutory 'abandonment' may be interpreted in a way that protects the infant's constitutional rights. . . . The mistake of law for several years by the agency, before *Stanley* and before this attempted visitation, does not detract from this child's constitutional right to a stable and permanent home. . . . [T]he child must not be prejudiced by such mistakes. . . .

> The court has fully considered the length of time that this child has spent with the same foster family and finds that the warm and loving relationship recognized by all parties, between the infant and his foster family with whom he has lived so long, is so important to this child that *it becomes inimical to the welfare of this child to try to strengthen the natural parent child relationship. . . .*" (emphasis added).

*In Re Male L.* (1975), 82 Misc. 2d 345, 369 N.Y.S. 2d 273, 276-277.

*In Re P.* (1971), 36 Mich.App. 497, 194 N.W.2d 18, was a case factually

---

1. *See* Goldsmith, Freud & Solnit, Beyond the Best Interests of the Child (1974).

similar to the present one. An unwed mother gave her consent to adoption; the unwed father, within ten days after the consent was given, acknowledged paternity. After several hearings, the trial court awarded custody to the natural father, and the child was placed in a foster home pending the appeal. The Michigan Court of Appeals noted the expedition and diligence on the part of the father. But, that Court considered another problem in reaching its decision.

> "The more important question, however, has not yet been answered, *i.e.*, given the natural rights of the father is it in the best interests of the child to award custody to the father? The welfare of the child is of paramount concern in custody cases and the superior rights of a parent are enforced only when they accord with the best interests of the child. . . ."

194 N.W. 2d at 20. The Court did find that the nine and one-half month old child's interests would be best served by granting the father custody. However, the Court specifically reserved the question before us today. "If a familial relationship had been established between the child and some adoptive parents we would have a substantially different question. . . ." *Id.*

There are other considerations regarding the child's rights. Does the child have a right to get to know and appreciate who her father is? *See Pierce v. Yerkovich* (1974), 80 Misc. 2d 613, 363 N.Y.S. 2d 403. Should the child be afforded the opportunity to visit with Father in the event that custody is finalized in the adoptive parents?[2] Or, should Father-child anonymity be preserved by means of an *in camera* custody proceeding?

The United States Supreme Court, in *Quilloin v. Walcott, supra,* noted that the adoption, in that case, resulted in the full recognition of a family unit already in existence. It appears that there is a family unit already in existence in the Father-Mother controversy. As we remand this case to the trial court, we must emphasize that despite whatever mistakes

---

2. *See generally* Comment, 70 Mich.L.Rev. 1581 at 1583 (1972); Note, *Domestic Relations—Illegitimate Child—Visitation Rights Granted to Putative Father*, 26 Alb.L.Rev. 335 (1962).

were made by the court, despite whatever harms were visited upon either Father or Mother by each other,[3] the overriding concern in the custody proceeding must be the best interests of the child.[4]

## IV.

## Conclusion

Father should have been allowed to utilize the discovery tools necessary to locate his child for the purpose of appearing at the hearing on her adoption. Father was prevented from participating by the actions of Mother. Any alleged "promise to consent" was not enforceable, worked no estoppel against Father, and is contrary to public policy. Since there was no enforceable contract, there was no basis for damages. The award of $3,000.00 against Father must be reversed.

This cause is reversed and remanded for a hearing regarding the custody of the child.

Buchanan, C.J. (by designation) concurs;

Hoffman, J., concurs.

NOTE — Reported at 379 N.E.2d 467.

---

3. A student writer has structured the dilemma:

"It would seem that any attempt to give notice to the putative father can probably be thwarted by an uncooperative mother. . . . Of course, permitting the putative father to upset the transfer of custody if the mother in any way prevented notice from reaching him would provide an effective remedy for vindicating a right to notice. However, such a remedy would jeopardize the child's interest in early and permanent placement. In short, while a right to notice of hearings transferring custody may seem appropriate in the abstract, the remedy necessary to safeguard this right is unacceptable. . . ."

Note, 1971 Wis.L.Rev. 1262, 1270-1271. *See also* Comment, 70 Mich.L.Rev. 1581, 1607, footnote 170.

4. *See Rothstein v. Lutheran Social Services* (1972), 405 U.S. 1051. The United States Supreme Court remanded the case to the Supreme Court of Wisconsin for further action in light of *Stanley* "with due consideration for . . . the fact that the child has apparently lived with the adoptive family for the intervening period of time."