509 N.E.2d 214 (1987)
B.G., Appellant, (Respondent below),
v.
H.S., Appellee, (Petitioner below).
No. 45A03-8608-JV-243.
Court of Appeals of Indiana, Third District.
June 24, 1987.
Rehearing Denied August 10, 1987.
Joel C. Levy, Judith A. Levy, Singleton, Levy, Crist & Johnson, Highland, for appellant.
Elizabeth G. Tegarden, Barbara J. Schmidt, Legal Services Program of Greater Gary, Inc., Gary, for appellee.
STATON, Judge.
This interlocutory appeal arises from a paternity action, initiated by H.S., claiming that he is the father of a baby girl born to B.G. in October of 1984. B.G. filed a number of pretrial motions, including a motion to dismiss because the child had been adopted and was not within the jurisdiction of the juvenile court. She appeals the denial of these motions. Because we reverse the denial of B.G.'s motion to dismiss, we need not discuss the other rulings.
Our threshold issue is whether Indiana has sufficiently protected the opportunity of H.S., an unwed father, to establish a responsible parental relationship with his child.[1] If so, then the adoption is valid and H.S.'s paternity action should have been dismissed. We reverse.
B.G. and H.S. lived together in Florida for a period of at least five months in 1983, beginning in April or May of that year. H.S. testified at deposition that he and B.G. last had sexual intercourse in early January, 1984. He further testified that he saw B.G. again for a short conversation in April, 1984, but that he did not see her again before the baby was born.
*215 B.G. gave birth to a baby girl on October 4, 1984. In her verified answer and in her deposition she stated that she consented to adoption shortly after the birth and that she did not know the whereabouts of the child.
H.S. testified that on August 15, 1984, he sent a certified letter, by counsel, to B.G. at her parents' address. In the letter, H.S. acknowledged paternity of B.G.'s child, offered support, and specifically withheld consent to adoption. In his original petition to determine paternity, H.S. alleged that B.G. gave birth to a child on or about August 30, 1984. This petition was filed on November 29, 1984, three months after the alleged birth date of B.G.'s child and almost two months after the actual birth date.
The United States Supreme Court has examined the extent to which an unwed father's biological relationship with his child merits protection under the Due Process Clause in four cases. Stanley v. Illinois (1972), 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551, involved the constitutionality of an Illinois statute that conclusively presumed an unwed father to be unfit to have custody of his children. In Stanley, the father had lived with his children all their lives and had lived with their mother for eighteen years. Under the statute, when their mother died, the children automatically became wards of the state; the nature of their relationship with their father was completely irrelevant. The Supreme Court held that the Due Process Clause was violated by the automatic destruction of the father's custodial relationship, recognizing that preservation of "a subsisting relationship with the child's father" might best serve the child's best interest. 405 U.S. 654-55 n. 7.
In two subsequent cases, Quillon v. Walcott (1978), 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511, and Caban v. Mohammed (1979), 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297, the court further discussed and refined the parental interests of unwed fathers. Finally, in Lehr v. Robertson (1983), 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 the Court distinguished between a developed parent-child relationship, such as was involved in Stanley, and a mere biological link  a potential relationship. The Court wrote that:
When an unwed father demonstrates a full commitment to the responsibilities of parenthood by "com[ing] forward to participate in the rearing of his child," Caban, 441 U.S. at 392, 99 S.Ct., at 1768, his interest in personal contact with his child acquires substantial protection under the Due Process Clause. At that point it may be said that he "act[s] as a father toward his child." Id. at 389, n. 7, 99 S.Ct., at 1766, n. 7. But the mere existence of a biological link does not merit equivalent constitutional protection. The actions of judges neither create nor sever genetic bonds.
.....
The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development. If he fails to do so, the Federal Constitution will not automatically compel a State to listen to his opinion of where the child's best interests lie.
Lehr, supra, 463 U.S. at 261-62, 103 S.Ct. at 2993-94 (footnotes omitted).
Lehr was similar to the case before us. Lehr, the father of a child born out-of-wedlock, petitioned to vacate an adoption decree on the ground that New York had violated his due process rights to notice and a hearing. The mother married about three months after the child's birth, and her husband petitioned to adopt the child about a year later. Lehr did not live with the child and had not supported her. The New York adoption statutes designated seven categories of putative fathers entitled to receive notice of pending adoption proceedings, including those who had filed with the state's putative father registry, before or after the birth of the child, notice *216 of intent to claim paternity. Lehr had not filed such notice, and fit none of the other categories.
The Supreme Court, as we have said, considered it significant that Lehr had never had any significant custodial, personal, or financial relationship with his daughter, and framed the issue as follows: "[W]hether New York has adequately protected his opportunity to form such a relationship." Lehr, supra, 463 U.S. at 262-63, 103 S.Ct. at 2994.
In its analysis, the Court noted that, "[i]f this scheme were likely to omit many responsible fathers, and if qualification for notice were beyond the control of an interested putative father, it might be thought procedurally inadequate." Lehr, supra, 463 U.S. at 263-64, 103 S.Ct. at 2994. Because Lehr could have qualified to receive notice of adoption proceedings merely by mailing a postcard to New York's putative father registry, the Court found that he had, in fact, been afforded due process. The New York statute effectively accommodated both the father's interest in establishing a relationship with his child, and the interest of the child and the state in prompt and final adoption procedures.
Our case is similar to Lehr in that it involves an unwed father who has not developed a full, responsible relationship with his child. Like Lehr, H.S. challenges the sufficiency of the state's protection of his opportunity to establish such a relationship. Indiana's adoption statutes are not as precise as New York's statutes as to who should receive notice of adoption proceedings, but that does not render them per se unconstitutional. The Indiana statute provides that notice should be given to putative fathers, but it does not define that term. IC 31-3-1-6(e). Presumably it would include those fathers named by the child's mother on the birth certificate, or in some other context available to the investigating agency or to the clerk of the court in which the petition for adoption is pending.
If Indiana law is to pass constitutional muster under Lehr, it must also provide some means by which fathers may unilaterally identify themselves as putative fathers and entitle themselves to notice of adoption proceedings. While the adoption statute does not make reference to it, our paternity action statute provides that "a man alleging that he is the child's biological father, or that he is the expectant father of an unborn child" may file a paternity action. IC 31-6-6.1-2(a)(2). Consent or cooperation of the child's mother are not required. As the statute indicates, a man may file such an action before the child is born. The paternity statute refers to such a man as an "alleged father," IC 31-6-6.1-1, and presumably he would be entitled to notice as a putative father under the adoption statute.
Another important consideration is whether these provisions are likely to omit many responsible fathers. See Lehr, supra, 463 U.S. at 264, 103 S.Ct. at 2994. Put another way, we must consider whether the statutory scheme places too great a burden on those unwed fathers who must act to protect their own rights. The New York statute upheld in Lehr required only that such men mail a postcard to the state's putative father registry indicating an intent to claim paternity, either before or after the birth of the child. Requiring unwed fathers to initiate a paternity action in order to ensure that they receive notice of adoption proceedings certainly places a greater burden upon them than requiring that they mail a postcard, yet we cannot say that it is an onerous burden. What is at stake is an unwed father's opportunity to develop a full parent-child relationship, with its attending financial and other responsibilities. It is not unreasonable to require that in order to protect this opportunity, an unwed father be required to take a step toward establishing such a relationship and toward accepting such responsibilities.[2]
*217 It is unfortunate but true that a man may be unaware that he has fathered a child. It is equally true, and equally unfortunate, that the mother and her family can prevent the man from learning of the pregnancy. Yet a man must accept some responsibility in the matter. Due process does not require that every possible biological father be given notice of adoption proceedings  only that the notice scheme not omit many responsible fathers. Lehr, supra, 463 U.S. at 264, 103 S.Ct. at 2994. The fact that a man does not know or fails to learn that he has fathered a child reduces the likelihood that he will step forward to establish a responsible parent-child relationship.
The best interests of the child are the primary concern in an adoption proceeding. IC 31-3-1-8; Unwed Father v. Unwed Mother (1978), 177 Ind. App. 237, 379 N.E.2d 467, 472. In this regard, the state has a strong interest in providing stable homes for children, and early, permanent placement with adoptive families furthers the interests of both the child and the state. See Lehr, supra, 463 U.S. at 264-65, 103 S.Ct. at 2995; Unwed Father v. Unwed Mother, supra, 379 N.E.2d at 472; P and P v. Children's Services Division, supra, 673 P.2d at 868. The mother of a child born out-of-wedlock also has an interest in privacy  in avoiding exposure or harassment. See Lehr, supra, 463 U.S. at 264, 103 S.Ct. at 2994; P and P v. Children's Services Division, supra, 673 P.2d at 868. Matter of Karen A.B. (1986), Del. Supr., 513 A.2d 770.
Given these interests, the nature of the unwed father's interest, and the minimal likelihood that many responsible unwed fathers will fail to receive notice under Indiana's adoption statutes, we conclude that the statutes adequately protect an unwed father's opportunity to develop a responsible relationship with his child. Were we re-drafting the statutes, we might state with greater precision just who is a putative father, entitled to notice of adoption proceedings. That, however, is not the task of judges.
The trial court's denial of B.G.'s motion for dismissal is reversed.[3]
GARRARD, P.J., and YOUNG, J., concur.
NOTES
[1] B.G. disputes that H.S. is the biological father of her child, but for the purpose of resolving this issue, we will assume that he is.
[2] The Court of Appeals of Oregon has upheld a statutory scheme which provides that, in order to unilaterally protect his rights to notice of adoption proceedings, an unwed father must initiate statutory filiation proceedings, similar to Indiana's paternity action. P and P v. Children's Services Division (1983), 66 Or. App. 66, 673 P.2d 864. Although the Oregon statute is more specific than the Indiana statute in defining those putative fathers entitled to notice, the two are similar in this respect.
[3] In her brief, B.G. requested costs of attendance at deposition, costs of transcribing B.G.'s and H.S.'s depositions, and attorney's fees on appeal. This request is denied.