Emma DABER and Thomas Daber,
Respondents Below, Appellants,

v.

DIVISION OF CHILD PROTECTIVE
SERVICES, Petitioner
Below, Appellee.

Supreme Court of Delaware.

Submitted: Nov. 7, 1983.
Decided: Dec. 19, 1983.

Dennis M. McBride, Walsh & McBride,
Wilmington, for appellants.

Carol E. Delaney, Deputy Atty. Gen.,
Wilmington, for appellee.

Before HERRMANN, C.J., MOORE and CHRISTIE, JJ.

MOORE, Justice:

Following trial in the Family Court, Emma and Thomas Daber appeal an order terminating their parental rights in their youngest son, Robert.[1] The order was issued because of (a) their inability to plan adequately for Robert's physical needs or his mental and emotional health and development, and (b) the conditions which led to Robert's placement still persist, and there appears to be little likelihood of their remedy. Based on these determinations, we conclude that the Family Court properly terminated the Dabers' parental rights as being in Robert's best interests. Accordingly, we affirm.

### I.

This case has a long and sad history. Robert is a mildly retarded sixteen year old with significant speech problems. He is the youngest of the Dabers' eleven children. At different times all eleven of them have been in the care of various social agencies. In July 1967, when Robert was four months old, the Family Court awarded temporary custody to the then Department of Public Welfare because of the Dabers' serious neglect of the child. Medical examination revealed him to be a malnourished infant. Almost immediately, he was placed in a foster home under the care of William and Mary Chadd, who since then have raised him as their own son. At various times Robert visited the Dabers monthly, despite his reluctance to do so. Eventually, his objections to these visits became so strong

that he began crawling under a bed and refusing to emerge when the social worker arrived to accompany him.

The present proceedings arose in 1981 when the Chadds sought to adopt Robert—an action which was in accordance with Robert's ardent desires. However, without the Dabers' consent, which they fervently withheld, no adoption was possible unless a termination proceeding was instituted.[2]

On April 9, 1981, the Division of Child Protective Services (the Division) petitioned to terminate the Dabers' parental rights in Robert. See 13 *Del.C.* § 1104(7) (1981). Thereafter, the Family Court entered a stipulated order requiring counseling for and psychological evaluations of Robert, his natural parents, and his foster parents. The order also permitted frequent visitation by the Dabers. After hearing the termination petition, the Family Court entered the order from which this appeal is taken.

The 1981 court-ordered psychological evaluation of Robert revealed that he is in the borderline mentally defective range of intellect, caused by environmental deprivation and lack of proper care during the first four months of his life while he was in the Daber home. On the Wechsler Intelligence Scale for Children—Revised, Robert received a Verbal Score of 51, a Performance Score of 67, and a Full Scale IQ Score of 55. On the Wide Range Achievement Test (WRAT), Robert has a reading and word-recognition grade level of 2.5 and is in the 0.6 percentile when compared to others of his physical age group. Results from the WRAT also indicate a spelling ability equivalent to grade level 2.4, i.e., the first percen-

---

1. The Court has used pseudonyms to protect the identities of the natural parents, the child, and his foster parents.

2. 13 *Del.C.* § 907(a) provides in pertinent part:
   *Consent to adoption.*
   (a) No petition for adoption not containing a consent to the proposed adoption shall be filed. The consent shall be in writing, notarized and annexed to the petition as an exhibit . . .
   13 *Del.C.* § 907(a) (1981).

The necessity for parental consent here is found in 13 *Del.C.* § 908(2)b., which provides in pertinent part:
   (2) If the parental rights of the parent or parents with respect to the child have not been *legally terminated, the consent shall be given as follows:*
   \*　　\*　　\*　　\*　　\*　　\*
   b. By the parents of a child born in wedlock, or the survivors if one such parent is deceased . . .
   13 *Del.C.* § 908(2)b. (1981).

tile, and an arithmetic ability level equal to grade K.8, i.e., the 0.04 percentile. Apart from Robert's mental retardation, he also has a significant speech problem which has prevented the development of his interpersonal communication skills and which may contribute to future serious emotional maladjustment. Despite these handicaps, the psychological study of Robert concluded that with proper parental care and speech therapy, he could potentially test in the Low Average to Average range of intellect with respect to performance, as opposed to reading and writing, skills. Robert will need close care, supervision, and special training beyond age twenty-one.

His natural parents were also evaluated psychologically. Emma Daber, age 49, is a mildly retarded woman who relies substantially on her husband for emotional support and requires his close supervision. She is functionally illiterate. While she has provided the physical essentials for her family, she can not effectively meet any atypical need. She admitted that she felt she could manage Robert only because two of her other children were no longer living at home. She does not recognize the special care which Robert will need. Thomas Daber, age 65, is borderline mentally deficient. His interpersonal skills are primitive, and he has a low frustration tolerance. He is a rigid individual who is used to getting his own way and has feelings of inferiority and hostility. He resents losing his son to another family because that reflects negatively on his ability to take care of the child.

William and Mary Chadd, Robert's foster parents, have cared for him since his removal from the Daber home at the age of four months. Mr. Chadd, age 50, is free of psychopathology and is physically stable. He tested creative and has the patience and judgment to meet Robert's special needs. Similarly, Mary Chadd, age 46, is free of psychopathology with good insight, ability to organize homelife, and patience. Both Mr. and Mrs. Chadd admitted that they had experienced the trauma of discovering that Robert was handicapped and the difficulty of accepting that fact. However, both acknowledge Robert's limitations and realize that caring for him will be a lifelong obligation. Accordingly, they have arranged for Robert to enter a trade school oriented to the special education of children. They have also provided for parental substitutes should they die or lose the capacity to care for Robert, who has consistently and continuously expressed a desire to be adopted by the Chadds.

## II.

The Dabers argue that the record does not support the Family Court findings that they have failed to adequately plan for Robert's mental and emotional health and development. They contend that the trial court erroneously relied upon expert witnesses who based their opinions upon circumstances existing when Robert had little or no contact with his parents. Furthermore, these witnesses did not know how the Dabers had coped with or provided for their other children with special needs.

The parents also blame the Division for not giving them any direction or assistance to help correct any failings which negated Robert's return to them. They claim to be unaware of what these inadequacies may be, and state that the Division had a duty to inform them of the relevant circumstances.

The Dabers further contend that the Division failed to establish at least 2 of the statutory prerequisites for termination of parental rights—(a) an inability to plan adequately for the child's physical needs or his mental and emotional health and development, and (b) that the conditions which led to the child's placement still persist, and there appears to be little likelihood of their remedy. See 13 *Del.C.* § 1103(5)(a)2. (1981).

Finally, the Dabers argue that with their known mental deficiencies, the Division had a "due process" obligation to advise them of their inadequacies, and an "equal protection" duty to give them counseling and psychotherapy before seeking a termination of parental rights.

The Division responds that the statutory criteria for terminating the Dabers' parental rights were established by clear and convincing evidence, which amply demonstrated that they are unable and have failed to plan for Robert's mental and emotional health and development. The focus of the issues here was properly on the Dabers' inability to meet Robert's needs, not those of their other ten children. The Division notes that these parents never independently initiated any steps for Robert's return. Despite efforts by social workers to impress upon the Dabers that Robert had specialized needs, the parents never demonstrated any comprehension of the subject.

### III.

Fewer rights are more sacred than those which derive from the parent-child relationship. A society which arrogates to itself the power to intervene and disrupt that relationship can do so only for the most compelling reasons necessary to correct or protect a child from circumstances which directly threaten or affect the minor's physical or emotional health. The State and its agencies are not in the business of determining or otherwise interfering with the parent-child relationship on any less substantial grounds.

This places in the balance issues of parental rights versus responsibilities, and when there is an absence of performance of the latter, there is no presumption or compelling rule that the former are entitled to any overriding or paramount considerations in the scale of human values and relationships.

Under 13 *Del.C.* § 1104(7), "[a] petition for the termination of parental rights may be filed by. . . . [a]n authorized agency or the State Department of Health and Social Services." 13 *Del.C.* § 1104(7) (1981). A court may grant a termination petition if two requirements are met: 1) that facts justifying termination of parental rights exist and 2) that such termination would be in the best interests of the child. *Cline v. Hartzler,* Del.Supr., 227 A.2d 210, 212 (1967). See 13 *Del.C.* § 1108(a) (1981). See also *Division of Social Services v. Tusiki,* Del.Fam.Ct., 446 A.2d 1109, 1111 (1982) (termination due to abandonment requires findings of abandonment and termination in child's best interest).

Section 1103 sets forth the grounds for terminating parental rights. See 13 *Del.C.* § 1103 (1981). It provides in pertinent part that:

The procedure for termination of parental rights for the purpose of adoption or, if a suitable adoption plan cannot be effected, for the purpose of providing for the care of the child by some other plan which may or may not contemplate the continued possibility of eventual adoption, may be initiated whenever it appears that:

(5) The parent or parents of any child, or any person holding parental rights over such child, *are not able, or have failed, to plan adequately for the child's* physical needs or his *mental and emotional health and development and:*

a. In the case of a child in the care of an authorized agency:

1. *The child has been in the care of an authorized agency for 1 year,* or there is a history of previous placement or placements of this child, or a history of neglect, abuse or lack of care of other children by this parent; *and*

2. *The conditions which led to the child's placement still persist,* and there appears to be *little likelihood that those conditions will be remedied at an early date* so that the child can be returned to the parent in the near future.

*Id.* § 1103(5)a. (emphasis added).

As to the second requirement enunciated in *Cline v. Hartzler,* the best interests of the child, this Court does not apply an inflexible rule. *Matter of Three Minor Children,* Del.Supr., 406 A.2d 14, 19 (1979). Rather, our inquiry "necessarily depends upon the facts in the context in which the petition is presented". *Id.* In *Matter of Three Minor Children,* we held that the statutory criteria for determining a child's

best interest in a custody action apply with equal force to a termination proceeding. *Id.* [applying the criteria set forth in 13 *Del.C.* § 722(a)]. Section 722(a) requires that

"[i]n determining the best interests of the child, the Court shall consider all relevant factors including: (1) the wishes of the child's parent ..., (2) the wishes of the child ..., (3) the interaction and interrelationship of the child with ... any other person who may significantly affect the child's best interests, (4) the child's adjustment to his home, school, and community, and (5) the mental and physical health of all individuals involved."

*Id.* § 722(a). See also *William H.Y. v. Myrna L.Y.,* Del.Supr., 450 A.2d 406, 409 (1982) (welfare and best interest of child to ensure child has a decent and respectable home are paramount in custody action). In *In re E,* Del.Supr., 239 A.2d 626, 628 (1968), this Court terminated parental rights, pointing to several factors indicating that termination was in the best interests of the child. *Id.* These included the facts that the child had known no other parents besides the adoptive parents, that she was known by their name, that she had an excellent school record, that her home environment was healthy, and that she was a normal child with a secure sense of belonging. *Id.*

If both of the *Cline* requirements are met, then a court may order the termination of parental rights. See *Cline,* 227 A.2d at 212. Section 1112 delineates the effect of a termination order, stating in pertinent part:

Upon the issuance of an order terminating the existing parental rights and transferring such parental rights to another person or organization, the effect of such order shall be that all of the rights, duties, privileges and obligations recognized by law between the person or persons whose parental rights are terminated and the child shall forever thereafter cease to exist as fully and to all intents and purposes as if the child and the person or person whose parental rights have

been terminated were and always had been strangers.

13 *Del.C.* § 1112 (1981). Section 1113 requires us to resolve all questions of statutory interpretation in such a way as to achieve without undue delay the paramount objective of the best interest of the child. *Id.* § 1113. Section 1113 also requires that where the best interests of the parent(s) and the child appear to conflict, those of the child shall prevail. *Id.* § 1113.

■ The standard of proof imposed upon a petitioner in a termination proceeding is that of clear and convincing evidence. *Patricia A.F. v. James R.F.,* Del.Supr., 451 A.2d 830, 831–32 (1982) [overruling *Matter of Five Minor Children,* Del.Supr., 407 A.2d 198 (1979) and following *Santosky v. Kramer,* 455 U.S. 745, 102 S.Ct. 1388, 1402–03, 71 L.Ed.2d 599 (1982)]. Our scope and standard of review on appeal is controlled by *Levitt v. Bouvier,* Del.Supr., 287 A.2d 671, 673 (1972). See *Bruce E.M. v. Dorothea A.M.,* Del.Supr., 455 A.2d 866, 869 (1983).

## IV.

■ In considering the first requirement of *Cline,* the Family Court properly concluded that the mandates of Section 1103(5)a. had been established by clear and convincing evidence. First, the record shows that Robert's natural parents have been and continue to be unable to plan adequately for his mental and emotional health and development. See 13 *Del.C.* § 1103(5). The mother, a functional illiterate, is almost entirely dependent on her husband, and can not effectively meet any atypical or special needs of Robert beyond providing food, clothing, and shelter. The father, whom Emma Daber relies upon for supervision and guidance, has a low level of patience and frustration tolerance. He has feelings of inferiority and hostility, as illustrated by his view that Robert's adoption would indicate an inability to care for his son. Moreover, the father does not recognize the nature of Robert's handicap or the extent of care which Robert requires. This is illustrated by the father's view that when

Robert reaches age eighteen, he can choose to live on his own or with whomever he wishes. Second, it is clear that Robert has been in the care of an authorized agency in excess of one year. *See* 13 *Del.C.* § 1103(5)a.1. (1981). Robert was removed from the Daber home in 1967 at the age of four months, when his parents were charged with neglect. Immediately thereafter, the then Department of Public Welfare placed Robert with his foster parents, the Chadds. Robert has remained with them since that time. Third, the Family Court properly concluded that the conditions which led to Robert's placement continue to exist, and there appears to be little likelihood that these conditions will be remedied at an early date so that Robert can be returned to the Dabers in the near future. *See* 13 *Del.C.* § 1103(5)a.2. (1981). Robert was originally placed with the Chadds because his natural parents were found to have neglected him.[3] The record establishes by clear and convincing evidence that Robert's mental deficiency was materially caused by his parents' neglect and failure to provide proper care during the first four months of his life. The record further establishes that Robert's natural parents cannot provide proper care for him at this time. The trial court properly concluded that it is unlikely that these familial conditions will be remedied at an early date, allowing Robert to be returned to the Dabers in the near future. Accordingly, the requirement of Section 1103(5)a. were satisfied, and termination was appropriate.

 Turning to the second requirement of *Cline,* that termination must be in the child's best interests, the trial court's conclusion was obviously correct. Robert has lived with the Chadds for over sixteen years. He has known no other home. He has a strong need to identify with one set of parents. He desires to remain with the Chadds and to be adopted by them. The trial court concluded properly that his needs could be better met by the Chadds, who have arranged an educational program consistent with Robert's needs, which they recognize will last indefinitely. Moreover, they possess the patience and other personal characteristics necessary to meet those needs, even to the extent of providing substitutes for themselves in the event of death or incapacity. These circumstances are a marked contrast to the pitiful conditions and attitudes of the natural parents.

Finally, we note from the evidence that Robert's tragic handicap might have been avoided entirely, or at least materially lessened, had his natural parents met their responsibilities during the first four months of his life. The Chadds freely assumed those duties and have ably met them during the past sixteen years. But in saying this, our affirmance of the trial court is not intended as a penalty to be visited upon the Dabers because of their prior neglect of Robert. Rather, it is his best interests that are at stake, and the record admits of no other rational conclusion but that the Dabers by reason of their very limited emotional and intellectual faculties are thoroughly inadequate to either cope with or meet Robert's very special needs. In weighing the issues of the Dabers' parental rights versus their ability to meet their responsibilities, or sadly, to even comprehend them, we must agree with the conclusions reached below and affirm the Family Court's termination order.

AFFIRMED.

---

[3.] Neglect is the threat or impairment of a child's physical, mental or emotional health or well-being because of inadequate care and protection by the child's custodian, who has the ability and financial means to provide adequate care. See 10 *Del.C.* § 901(11) (1982). Adequate care entails a type and degree of personalized attention which tends to advance a child's physical, mental, moral, emotional, and general well-being. See 10 *Del.C.* § 901(1) (1974).