(912 P.2d 761)

No. 73,805

In the Matter of the Adoption of BABY BOY S.

Opinion filed March 8, 1996.

*F. C. "Rick" Davis, II,* and *Kenneth H. Jack,* of Bruce & Davis, L.C., of Wichita, for appellant natural father.

*Martin W. Bauer* and *Ellen Tracy,* of Martin, Pringle, Oliver, Wallace & Swartz, L.L.P., of Wichita, for appellees A.L.L. and D.M.L., and Adoption Centre of Kansas, Inc.

Before RULON, P.J., ROYSE, J., and STEPHEN D. HILL, District Judge, assigned.

RULON, J.: V.A., the natural father of Baby Boy S., appeals from the district court's order terminating his parental rights and approving the adoption of Baby Boy S.

Essentially, we must decide if:

- Kansas adoption statutes as applied to the natural father violate the Due Process Clause of the United States Constitution,
- substantial competent evidence supports the district court's finding that the natural father lacked reasonable justification for his failure to support the natural mother during 6 months immediately preceding the birth of Baby Boy S., and
- substantial competent evidence supports the district court's finding that the natural father was an unfit parent.

We affirm.

## FACTS

Baby Boy S. was born on April 26, 1994, in Wichita, Kansas, and his natural mother, R.S., relinquished the newborn infant to the Adoption Centre, Inc., of Kansas, a licensed adoption agency. R.S. left Wichita in May 1994 and moved to North Carolina.

Baby Boy S. was placed with adoptive parents residing in Wichita on April 29, 1994. A petition for adoption was filed on June 8, 1994. Under K.S.A. 59-2133(b), notice of the adoption proceeding was served on V.A. on July 7, 1994. V.A. timely filed objections to the adoption and requested custody of the infant. V.A. at all times was a resident of Ohio.

Later, a petition to terminate V.A.'s parental rights was filed. Ultimately, the district court ordered V.A.'s parental rights terminated under K.S.A. 59-2136(h)(2) and (h)(4).

The findings of the district court can be summarized as follows:

R.S. left her parents' home in Whitehouse, Ohio, in May 1993 when she completed high school. She immediately moved in with V.A. and his parents in Toledo, Ohio. The relationship between R.S. and V.A. was tumultuous from the start due to V.A.'s dislike

of R.S.'s parents. R.S. left V.A. following a dispute about her parents.

By early July 1993, R.S. was again living with V.A. and his parents. In early August 1993, a home pregnancy test indicated R.S. was pregnant. V.A.'s parents took R.S. to their doctor, who confirmed the pregnancy and estimated the baby's due date as April 26, 1994. R.S. had three or four doctor visits with V.A.'s family physician. V.A.'s family took her to get a medical card through a state program. Unquestionably, V.A. knew that the baby was due at the end of April 1994.

While living with V.A.'s family, R.S. and V.A. did not pay any living expenses. In late August 1993, V.A. had a fight with his family about R.S. V.A. was so angry that he threw food and furniture and broke holes in the doors at his parents' residence. R.S. and V.A. were then told to move out.

After leaving V.A.'s parents' home in September 1993, R.S. and V.A. lived with several friends but eventually lived in their own apartment. R.S. signed the lease and arranged for the utilities, believing that V.A., who was working, would pay for them. After a fight with V.A., R.S. left on September 18, 1993, and returned to her parents' home.

Eventually, V.A. asked R.S. to resume their relationship. While he promised to be responsible for the baby, there was no offer of money, housing, or maternity clothes, nor did he offer to handle the medical bills associated with prenatal care or delivery. According to R.S,, V.A. was only concerned with renewing their relationship and did not inquire about the pregnancy.

About Thanksgiving 1993, R.S. moved out of her parents' house, moved in with a girlfriend, and began considering putting the baby up for adoption. She contacted a lawyer in Toledo who gave her a booklet of couples looking for babies. R.S. chose a couple who happened to live in Wichita, Kansas. She denied knowledge of any difference in the laws of Kansas or Ohio and testified that her lawyer did not suggest a Kansas couple. V.A. knew R.S. had left her parents' home.

Around Christmas 1993, R.S. and V.A. met accidently at a local shopping mall. He shouted at R.S. and chased her and one of her

girlfriends into a store. She and her girlfriend were frightened. The girlfriend told V.A. that R.S. had lost the baby because of a miscarriage. Whether R.S. confirmed the miscarriage to V.A. was disputed. Although he was uncertain if R.S. was still pregnant, V.A. made no effort to follow up to determine the status of the pregnancy.

Eventually, in December 1993, R.S. began living with a new boyfriend, A.T., in his parents' house in Ohio.

In early January 1994, V.A. received correspondence from a Texas adoption agency, indicating that R.S. desired to put her unborn child up for adoption. He called the agency to express his opposition to the adoption. Later, he approved a letter drafted by his father's attorney opposing the adoption, expressing his intention to keep the child and conveying a written acknowledgement of paternity. V.A.'s copy of the letter included a hand-written note from the lawyer to V.A.'s father stating that the response "should take care of the situation until the baby is born." V.A. had no direct contact with the lawyer.

V.A. did not tell the Texas agency he would support the mother during her pregnancy. He did not ask for R.S.'s address, nor did he ask the agency to convey any message offering support. He did not contact R.S.'s family or any of her known friends to offer financial support or to express his opposition to the adoption.

A.T. and R.S. moved to Wichita in February 1994. The Adoption Centre helped them find an apartment and paid their bills. R.S. obtained a listed phone number under her name.

After receiving the Texas adoption agency letter, V.A. also contacted a cousin of R.S. In April 1994, R.S.'s cousin told V.A. that R.S. was somewhere in Kansas. Between the end of April (the due date) and June 7, 1994, V.A. did not contact the Texas adoption agency, R.S.'s family, or her friends to determine if the baby had been born.

In June 1994, V.A.'s father learned of an agency called Find People Fast and requested that they locate R.S. Eventually, V.A. learned of R.S.'s location in Wichita. He did not attempt to contact her even though he knew the baby probably had been born in late April. He did not contact an attorney to discuss custody, visitation,

or what he needed to do to establish or preserve his relationship with the child.

V.A. first received confirmation of the baby's birth on July 5, 1994, when a private investigator hired by the Adoption Centre contacted him. He was served with notice of the adoption proceeding on July 8, 1994. Prior to that time, he had no knowledge that anyone other than R.S. had custody of the baby.

Based upon the above findings, the district court concluded that V.A. failed to provide support for R.S. during the 6 months prior to the child's birth and did not have reasonable cause for not providing support. The district court relied upon V.A.'s failure to offer any form of financial support to the mother after she moved out of their apartment on September 18, 1993; that V.A. had disposable income which was available to provide support; and that V.A. and/or his parents forwarded unpaid doctor bills and utility bills to R.S.'s parents for payment. The court concluded that V.A. did not pursue all the opportunities and options available to him to carry out his duties.

The district court, in an alternative finding, terminated V.A.'s parental rights on the ground that he was an unfit parent. The court relied upon his failure to make financial arrangements to pay for prenatal care or delivery of the baby. The court found that V.A. was consumed with his personal desire to maintain a relationship with R.S. rather than caring about the unborn child. The court further found that V.A. had a violent temper, evidenced by his damage to property during his fits of anger, to the extent that he was asked to move out of his parents' home. The court further found that V.A. had violated the law by smoking marijuana.

## DUE PROCESS

We must decide if the provisions of K.S.A. 59-2136(h) can be applied here to terminate the father's parental rights to Baby Boy S.

K.S.A. 59-2136(h) provides:

"[T]he court may order that parental rights be terminated, upon a finding by clear and convincing evidence, of *any* of the following:

. . . .

(4) the father, after having knowledge of the pregnancy, failed without reasonable cause to provide support for the mother during the six months prior to the child's birth;

(5) the father abandoned the mother after having knowledge of the pregnancy." (Emphasis added.)

V.A. argues that due process requires that he be put on fair notice of the actions or inactions that could result in the termination of his parental rights. Because he was not a Kansas resident and could not anticipate the mother moving to Kansas, V.A. argues that application of Kansas law violated his constitutional right to due process. He argues that application of Kansas law impermissibly allows unwed mothers to "forum shop" for jurisdictions with stricter statutes to prevent unwed fathers from opposing an adoption. He claims he was entitled to fair warning of the required or proscribed actions which might have resulted in the loss of his parental rights.

V.A. cites to various cases where statutes providing for termination of parental rights were held unconstitutionally vague and insufficient to warn parents of conduct which could result in termination of their parental rights. However, he does not argue that K.S.A. 59-2136 is unconstitutionally vague. Instead, he argues that he had no way of knowing that K.S.A. 59-2136 would apply and, consequently, he did not know that his failure to support the mother could result in the termination of his parental rights.

V.A.'s claims essentially raise conflict of law questions, and such issues can implicate due process standards in some circumstances. The United States Supreme Court has long recognized that a certain set of facts giving rise to a cause of action might justify the application of the law of more than one state. See *Watson v. Employers Liability Corp.*, 348 U.S. 66, 72-73, 99 L. Ed. 74, 75 S. Ct. 166 (1954). In analyzing the due process principles in conflicts cases, the Supreme Court has said:

"In deciding constitutional choice-of-law questions, whether under the Due Process Clause or the Full Faith and Credit Clause, this Court has traditionally examined the contacts of the State, whose law was applied, with the parties and with the occurrence or transaction giving rise to the litigation. [Citation omitted.] In order to ensure that the choice of law is neither arbitrary nor fundamentally unfair [citation omitted], the Court has invalidated the choice of law of a State

which has had no significant contact or significant aggregation of contacts, creating state interests, with the parties and the occurrence or transaction." *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 308, 66 L. Ed. 2d 521, 101 S. Ct. 633 (1981).

The *Hague* Court further noted that when considering conflict of law questions "for a State's substantive law to be selected in a constitutionally permissible manner, that State must have a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair." 449 U.S. at 312-13.

V.A. does not challenge the Kansas court's jurisdiction over the adoption proceeding. R.S. had openly been a Kansas resident for at least 60 days prior to the birth of Baby Boy S. The child was born in Kansas and was relinquished to a Kansas adoption agency. The child has resided in Kansas with a Kansas adoptive family throughout the proceeding. Kansas has an interest in ensuring that children born and residing in this state are adequately provided for by responsible adults. When parents relinquish or otherwise ignore their parental obligations to a child living in Kansas, this state has a compelling interest in ensuring the child's well-being and, when appropriate, to ensure the children are adopted by responsible and caring families. Consequently, under the facts of this case, we conclude Kansas has significant contacts creating state interests in applying its laws.

When considering fairness in the context of a conflicts issue, an important element is the expectation of the parties. A state " 'may not abrogate the rights of parties beyond its borders having no relation to anything done or to be done within them.' " *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 822, 86 L. Ed. 2d 628, 105 S. Ct. 2965 (1985) (quoting *Home Ins. Co. v. Dick*, 281 U.S. 397, 410, 74 L. Ed. 926, 50 S. Ct. 338 [1930]). In *Shutts*, the Court invalidated the Kansas Supreme Court's decision to apply Kansas law to all gas leases involved in a class action, even though a vast majority of the leases and property owners had no connection with Kansas.

Applying Kansas law to the facts in this case does not unconstitutionally impair the reasonable expectation of the parties. It is not unreasonable for parties to expect that the standards for parental

obligations would be determined by the laws of the state where the child resides. This is consistent with Restatement (Second) of Conflict of Laws § 289 (1969), which provides that local law should control in cases of adoption.

Under these facts, it might also be constitutionally permissible to apply Ohio law. However, we believe Ohio's state interests are more tenuous than those of Kansas. R.S. left Ohio prior to the birth of the child and has not returned since. The child was born in Kansas. In our current mobile society, the place of conception of a child carries little weight. However, requiring an unwed father to make substantial efforts to remain in contact with an unwed mother and participate in the pregnancy and birth of the child, wherever it occurs, is not an unreasonable expectation.

Although V.A. likens R.S.'s travels to a helium balloon, he was aware that she was no longer living at her parents' home and knew almost 4 months before the baby's birth that she was considering an out-of-state adoption. However, he made no serious efforts to locate her whereabouts. The district court specifically found that R.S. did not move to conceal herself. Likewise, she testified that she did not choose to put her baby up for adoption through a Kansas agency in order to impose stricter parental obligations on the father.

V.A. relies heavily on the "fundamental" nature of his parental rights to emphasize that the law of his residence should control in this case. However, his actions (and inactions) minimized his liberty interest in initiating a parental relationship with Baby Boy S. This court explored the nature of an unwed father's interest in the parent-child relationship in *In re Baby Boy N.*, 19 Kan. App. 2d 574, 874 P.2d 680, *rev. denied* 255 Kan. 1001, *cert. denied* 513 U.S. 1018 (1994). In *Baby Boy N.*, this court upheld the constitutionality of K.S.A. 59-2136(h)(4), (5). In that case, an unwed father challenged the statute, arguing that his parental rights could not be terminated absent a specific finding that he was an unfit parent. 19 Kan. App. 2d at 579. This court, in studying United States Supreme Court precedent, noted:

"There is every reason for protecting the rights of a father to children, illegitimate or not, whom he has reared, loved, and supported. This is the true parental right

which we protect, and it involves not only the individual rights of the father but the broader concept of family, which is also entitled to protection. By the same token, where the father's 'right' is purely biological and there has been no family formed, no bonding, no support, and no love, that right seems to be obviously less deserving of support. Those instances specified under K.S.A. 38-113a and K.S.A. 1993 Supp. 59-2136(h)(1)-(7) in which consent may be declared unnecessary are examples of situations in which the right of a natural father is little more than biological." 19 Kan. App. 2d at 583-84.

The above reasoning is consistent with United States Supreme Court standards in *Lehr v. Robertson*, 463 U.S. 248, 77 L. Ed. 2d 614, 103 S. Ct. 2985 (1983). In *Lehr*, the Court held:

"When an unwed father demonstrates a full commitment to the responsibilities of parenthood by 'com[ing] forward to participate in the rearing of his child,' [citation omitted] his interest in personal contact with his child acquires substantial protection under the Due Process Clause. At that point it may be said that he 'act[s] as a father toward his children.' [Citation omitted.] But the mere existence of a biological link does not merit equivalent constitutional protection." 463 U.S. at 261.

Various state courts have addressed whether the application of forum law violated the due process rights of an unwed out-of-state father. All of these cases rely on the United States Supreme Court cases of *Lehr* and *Caban v. Mohammed*, 441 U.S. 380, 60 L. Ed. 2d 297, 99 S. Ct. 1760 (1979), in examining the statutes and facts in each case.

The Indiana Court of Appeals' decision in *B.G. v. H.S.*, 509 N.E.2d 214 (Ind. App. 1987), is not unlike the facts before this court. In *B.G.*, an unwed father challenged the adoption of his child in Indiana. The child's father and mother had lived together in Florida, where the baby was conceived. The father learned of the pregnancy 6 months before the baby's birth and before the mother returned to her family in Indiana. Several months before the baby's birth, the father sent a certified letter to the mother's parents acknowledging paternity, offering support, and stating his intent to refuse to consent to an adoption. The baby was born, and the mother signed a consent for adoption shortly thereafter. The father challenged the adoption, arguing that the Indiana statute requiring an expectant father to file a notice of paternity was unconstitutional.

The Indiana Court of Appeals reviewed the extent of the father's due process rights, noting that the Court in *Lehr* distinguished between a developed parent/child relationship and a mere biological link. 509 N.E.2d at 215. The court noted that Indiana law permitted an expectant father to file a paternity action prior to the birth of the child, holding that it was "not unreasonable to require, that in order to protect this opportunity [to establish a parent/child relationship], an unwed father be required to take a step toward establishing such a relationship and toward accepting such responsibilities." 509 N.E.2d at 216. The court concluded that the father's untimely paternity action should be dismissed. 509 N.E.2d at 217.

Similarly, in *Mullis v. Kinder*, 568 N.E.2d 1087 (Ind. App. 1991), the court upheld the constitutionality of the Indiana law applied in an adoption proceeding. The adult father was a Florida resident. The infant was conceived in Florida, and, thereafter, the 15-year-old mother returned to Indiana. The mother placed the baby up for adoption. The natural father objected to the adoption approximately 5 weeks after the petition for adoption was filed. The trial court held that the father's consent was not necessary based upon an Indiana statute which provided that a natural father's consent was not necessary when the pregnancy was the result of "child molestation." The father appealed, challenging the constitutionality of the application of the statute because he did not have notice of the " 'potential future implication' of the [Indiana] act" and relying on the principle of being entitled to notice of wrongful conduct. 568 N.E.2d at 1090. The Indiana Court of Appeals rejected the father's arguments by ruling that ignorance of Indiana law was "no excuse." 568 N.E.2d at 1090.

Finally, V.A.'s reliance on Ohio law defining the obligations of unwed fathers provides little support for his arguments. As noted below, Ohio law provides that in certain circumstances, failure to financially support an unwed mother during her pregnancy may make the unwed father's consent unnecessary in an Ohio adoption. See *In re Adoption of Klonowski*, 87 Ohio App. 3d 352, 354-56, 622 N.E.2d 376 (1993); *In re Adoption of Hart*, 62 Ohio App. 3d 544, 552, 577 N.E.2d 77 (1989).

For the above reasons we conclude that the application of Kansas law in this case did not deprive V.A. of any substantive or procedural due process rights.

## REASONABLE JUSTIFICATION

V.A. does not challenge the sufficiency of the evidence supporting the district court's factual findings that he did not support the mother during the 6 months before the birth of Baby Boy S. Instead, he argues that the facts found by the court fail, as a matter of law, to establish that the failure to support the mother was without "reasonable cause."

Our standard of review in a case where the district court has made findings of fact and conclusions of law has been defined as follows:

" 'When findings of fact are attacked for insufficiency of evidence or as being contrary to the evidence, the duty of the appellate court extends only to a search of the record to determine whether substantial competent evidence exists to support the findings. An appellate court will not weigh the evidence or pass upon the credibility of the witnesses. Under these circumstances, the reviewing court must review the evidence in the light most favorable to the party prevailing below.' " *In re Baby Boy N.*, 19 Kan. App. 2d at 586 (quoting *In re Adoption of F.A.R.*, 242 Kan. 231, Syl. ¶ 2, 747 P.2d 145 [1987]).

V.A. argues, however, that since he has not challenged the district court's factual findings, this court can review de novo the district court's conclusion that he lacked reasonable cause for failing to support the mother. A similar argument was rejected by our Supreme Court in *In re Adoption of Baby Boy B.*, 254 Kan. 454, 866 P.2d 1029 (1994). Because the testimony was conflicting in this case, de novo review is not appropriate. See 254 Kan. at 458-60. The fact that the father does not specifically challenge the district court's findings does not change the standard of review.

Determining whether the father has failed without reasonable cause to provide support for the mother during the 6 months prior to the child's birth as required by K.S.A. 59-2136(h)(4) is " 'analogous to cases where the trial court must determine if a parent has failed or refused to assume the duties of a parent for two consecutive years prior to an adoption pursuant to K.S.A. 1990 Supp. 59-

2136(h)(7).' " *In re Baby Boy N.*, 19 Kan. App. 2d at 587 (quoting *In re Adoption of Baby Boy S.*, 16 Kan. App. 2d 311, 313, 822 P.2d 76 [1991]). In making this decision, all relevant surrounding circumstances must be considered and may include the father's conduct more than 6 months before the birth of the baby. 19 Kan. App. 2d at 587. "[W]here a trial court finds that a father's reasonable efforts to provide for his child's welfare failed because of interference by the mother, adoption agency, or adoptive parents, the statute should not operate to terminate his parental rights." 19 Kan. App. 2d at 585.

As in the case of *In re Baby Boy N.*, there is no dispute here that the father provided no support, financial or otherwise, to the mother in the 6 months before she gave birth. V.A. argues that he had reasonable cause for failing to support the mother during the last 6 months of her pregnancy. V.A. argues that he was represented by counsel during the 6-month period and relied upon his attorney's representations that he need take no action. He states that the legal advice he received was correct in the two jurisdictions in question—Texas and Ohio.

A putative father's reliance on legal advice was rejected as "reasonable cause" in a case substantially similar to the facts here. In *In re Baby Boy N.*, 19 Kan. App. 2d 574, the putative father challenged the district court's finding that his parental rights should be terminated for failing to support the child's mother during the last 6 months of her pregnancy. 19 Kan. App. 2d at 575-76. The father argued that he consulted with an attorney as to what legal steps could be taken to prevent the adoption and was told there was nothing he could do until the child was born. This court upheld the trial court's finding that "the mere fact that [the father] could do nothing to prevent the adoption of the child prior to its birth did not constitute a reasonable excuse for his failure to provide support." 19 Kan. App. 2d at 588.

The district court in this case found that the only evidence of V.A.'s reliance on any legal advice was that he approved a letter sent to the Texas adoption agency to oppose the adoption. The court found that, at best, the attorney's message to V.A.'s father was that the letter to the agency "should take care of the situation

until the baby is born." Notwithstanding the indication that action needed to be taken once the baby was born, the court found that V.A. did little after the baby's anticipated due date to locate the child, assert parental rights, or assume parental responsibilities. There is no evidence that V.A. had any *direct* contact with his attorney, even after the baby's birth, until he was served with the petition for adoption. Moreover, there is no evidence that he had an ongoing attorney/client relationship during this period. Consequently, there is substantial evidence to support the district court's decision that his purported reliance on the note from his father's lawyer was not "reasonable cause" for his failure to support the mother during her pregnancy.

A review of Ohio law also undermines V.A.'s claim that his failure to support the mother was justified. Here, V.A. repeatedly asserts that failure to support a pregnant mother is not grounds for termination of parental rights under Ohio law. This is simply not the case. Ohio law provides that a putative father's consent is required before adoption if the father files an objection within 30 days of the filing of the petition or placement for adoption. Ohio Rev. Code Ann. § 3107.06(F)(4) (Anderson 1989). The adoption statutes further state, however, that consent of an unwed father is not necessary if he files an untimely objection with the court and, after notice and hearing, the court finds the putative father willfully failed to care for and support the child *or* abandoned the mother during her pregnancy. Ohio Rev. Code Ann. § 3107.07(B) (Anderson 1989).

V.A. argues that he did not abandon R.S., but that she left him. However, Ohio courts do not interpret Ohio Rev. Code Ann. § 3107.07(B) that narrowly. The scope of § 3107.07(B) was addressed by the Ohio Court of Appeals in *In re Adoption of Hart*, 62 Ohio App. 3d 544. In *Hart*, the court noted that the mother spent the last 5 months of her pregnancy with her parents and was supported by welfare. The father had provided no support for her during that time, other than paying for one prenatal blood test. Although the mother and child lived with the putative father and his parents for several months after the birth of the child, all support was provided by the child's grandparents rather than the fa-

ther. Under those circumstances, the appellate court upheld the finding of willful failure to support the mother during the pregnancy and the child after his birth. 62 Ohio App. at 553. Thus, "abandonment" under the Ohio statute includes failure to financially support the mother during pregnancy. See also *In re Adoption of Youngpeter*, 65 Ohio App. 3d 172, 175-76, 583 N.E.2d 360 (1989) (under Ohio law, a putative father has an obligation to support his minor child, including the payment of medical expenses attributable to the pregnancy of the mother).

Both Kansas law and Ohio law have held that substantial interference by the custodial parent preventing the other parent from supporting and interacting with the child can be grounds to preclude a finding that the child has been abandoned. See *In re Adoption of F.A.R.*, 242 Kan. at 237; *In re Adoption of Klonowski*, 87 Ohio App. 3d at 354-56; *In re Adoption of Youngpeter*, 65 Ohio App. 3d 176-78.

Here, V.A. failed to establish, however, that R.S. or her family substantially impaired any effort on his part to support R.S. during her pregnancy. Although he claimed that he offered financial support immediately after the mother left him, the district court found that no offer of support had been made. The court also determined that even if some offer was made, it was R.S.'s father, not R.S., that rejected support. In light of R.S.'s known tenuous relationship with her parents, the court's refusal to consider this one incident as "reasonable cause" is supported by substantial evidence.

Notwithstanding R.S.'s decision to leave V.A., he was not precluded from asserting his parental rights. There were several avenues he could have taken to reflect his intent to assume his parental responsibilities. Ohio law allows any man claiming paternity to bring an action to determine the existence or nonexistence of paternity. Such an action can be filed prior to the child's birth, although a contested paternity action will be stayed until the child's birth. Ohio Rev. Code Ann. § 3111.04(A), (C) (Anderson 1989). A paternity action may be brought in the county where the child, the child's mother, or the alleged father resides. Ohio Rev. Code Ann. § 3111.06(A) (Anderson 1989).

In addition, Ohio law permits a natural father to file an acknowledgement of paternity in the county where the father resides once the child is born. Ohio Rev. Code Ann. § 2105.18(A) (Anderson 1994). The filing of such an acknowledgement creates a presumption of paternity. Ohio Rev. Code Ann. § 3111.03(B) (Anderson 1989).

V.A. additionally argues that he had reasonable cause not to support the mother because (1) there was no evidence that the mother was deprived of adequate housing, clothing, food, or medical attention; (2) the mother broke her marriage engagement with him, thereby reducing his obligation to support her; and (3) the mother began cohabiting with another man. These arguments are groundless.

Neither Kansas law nor Ohio law requires an unwed father to provide support only if the mother has no other source of financial support. See, *e.g.*, *In re Adoption of Hart*, 62 Ohio App. 3d at 553-54 (support from grandparents did not prevent finding of father's willful failure to support mother and child). V.A. had no idea whether R.S. was receiving support from any source—her parents, her new boyfriend, or any governmental agency—because he chose to remain ignorant of the mother's whereabouts and circumstances.

V.A. additionally relies on general authorities controlling a husband's liabilities for necessaries furnished to the wife and an ex-husband's obligations to pay alimony when the ex-wife cohabits with another man. These authorities have no relevance to whether his *parental* rights should be terminated. As noted above, "[t]hose instances specified under K.S.A. 38-113a and K.S.A. 1993 Supp. 59-2136(h)(1)-(7) in which consent [to adoption] may be declared unnecessary are examples of situations in which the right of a natural father is little more than biological." *In re Baby Boy N.*, 19 Kan. App. 2d at 584. In essence, the mother's merit or character is not relevant to whether an unwed father is obligated to support the mother during her pregnancy in order to protect his rights to the unborn child.

For the above reasons, we conclude the district court's finding that V.A., without reasonable cause, failed to support the mother

during the 6 months prior to April 26, 1994, is supported by substantial evidence.

## UNFIT PARENT

Finally, V.A. challenges the district court's finding that he was an unfit parent. He argues that this portion of the district court's order was not supported by substantial evidence.

The standard of review in a case involving the termination of parental rights is whether there is substantial competent evidence in the record to support the trial court's decision that the parent was unfit and that the parental rights should be terminated. *In re S.M.Q.*, 247 Kan. 231, 240, 796 P.2d 543 (1990). Although the State has the burden to prove "unfitness" by clear and convincing evidence before the district court, the clear and convincing standard does not affect this court's scope of review. See 247 Kan. at 240. This court cannot reweigh the evidence, substitute its evaluation of the evidence for that of the trial court, or pass upon the credibility of the witnesses. The court must review the evidence in the light most favorable to the party prevailing below. 247 Kan. at 234; *In re T.D.W.*, 18 Kan. App. 2d 286, 289-90, 850 P.2d 947 (1993).

A parent must be found "unfit" by the trial court before parental rights may be severed. K.S.A. 1994 Supp. 38-1583(a); *In re M.M.*, 19 Kan. App. 2d 600, 607, 873 P.2d 1371 (1994). " 'The term "unfit" is defined to include inherent mental and emotional incapacity to perform parental obligations which can constitute such breach of parental duty as to make the parents unfit to be entrusted with custody of their child.' [Citation omitted.]" *In re N.D.G.*, 20 Kan. App. 2d 17, 21, 883 P.2d 89, *rev. denied* 256 Kan. 995 (1994); see *In re M.D.S.*, 16 Kan. App. 2d 505, 508, 825 P.2d 1155 (1992).

Briefly said, we have considered the record in light of our standard of review and firmly conclude that the district court did not err in terminating V.A.'s parental rights because he was an unfit parent.

Affirmed.