### In the Matter of BABY GIRL T. Born 9/3/96.

### File No. 96–12–01–TN.

Family Court of Delaware, New Castle County.

Submitted: Feb. 26, 1998.

Decided: April 3, 1998.

Ellen S. Meyer, Wilmington, for Adoptions from the Heart.

William L. O'Day, Jr., Wilmington, for Michael Evans.

## OPINION

ABLEMAN, Judge.

In this termination of parental rights proceeding, the Court is asked to terminate the parental rights of a father in his child on the ground of abandonment, in a situation where the father was unaware of his biological connection to the child until less than two months before this hearing, and where the father has sought to fulfill his parental responsibilities from the moment he learned of his identity as the child's father. The mother, who earlier voluntarily relinquished her rights to place the child for adoption, now takes the position that respondent-father should be permitted to raise his daughter although her voluntary consent has not been withdrawn. Thus, the issue in this case is whether a father can be deemed to have abandoned his child when he had no direct knowledge of the mother's pregnancy, was not informed when the child was born, and when the mother concealed respondent's identity as the child's father by naming another man as the putative father instead.

## I. Factual Background

The facts which give rise to this difficult case are largely undisputed. The child, who is the subject of this termination proceeding, was born on September 3, 1996. Stacy T., (hereinafter be referred to as "Mother"), was unmarried at the time and the man whom she believed to be the father, Ronald L., was then incarcerated. He had previously lived with Mother for an extended period of time. Since neither Mother nor Ronald L. were able to provide for their daughter, Mother contacted Adoptions from the Heart, (hereinafter "the Agency"), in order to place the baby for adoption. On September 4, 1996, Mother voluntarily consented to the termination of her parental rights. The child's custody was thereby transferred to the Agency for placement and adoption planning, and the infant was placed in the pre-adoptive home where she has remained since just after her birth.

Approximately three months later, on December 5, 1996, the Agency filed this termination of parental rights petition in the Family Court, naming as respondents, Mother and Ronald L., the presumptive father. The Agency alleged as its grounds for termination that the father had abandoned the child pursuant to 13 Del.C. § 1103(a)(2).

In response to the petition, Ronald L. filed a "Petition for an Injunction to Confirm Paternity", in which he requested blood testing and an Order confirming that he was the father of the child. He further stated that, in the event that he was confirmed as the father, he would not consent to the termination of his parental rights. On April 16, 1997, this Court ordered blood testing. On September 17, 1997, the blood test results excluded Ronald L. as the father of the child.

On October 22, 1997, the Agency filed a "Motion to Remove Ronald L. from the Petition for Termination of Parental Rights" and simultaneously filed the instant amended petition for termination of parental rights, naming Michael E. as the father. On January 13, 1998, the paternity test results were returned to the Court, establishing a 99.87% probability that Michael E. is the baby's father. Michael E. shall hereinafter be referred to as "Father."

Father was initially contacted by a social worker from the Agency, who left a message on his answering machine that advised him that he might have a daughter. He testified that he was shocked. Father promptly returned the call and met with an Agency representative within a matter of days. Although he did not believe that he was the child's father, he submitted to blood testing without delay and also advised the Agency that, if it was established that he was the child's biological father, he would not be willing to consent to adoption and would instead seek custody.

It was only weeks before the trial in this termination of parental rights case that Father received the paternity test results, confirming that he was the baby's father. As soon as the results were made known to Father, he had his attorney write to the Agency to request visitation. He was advised that visitation would not be permitted pending the outcome of this case.

Father's surprise and shock at learning that he was the child's father was understandable in light of the history of his relationship with Mother. It is also understandable that Father would want to know with certainty that he was actually the father as a result of previous circumstances in that relationship, which were recounted at trial.

Father first met Mother approximately four years earlier, in late 1994, when he was employed at a gas station and Mother needed assistance. The couple began dating and first had sexual relations a few weeks later. The couple began living together in 1994 and remained together until late 1995. During this period, they had numerous arguments and altercations, and Father was arrested on three occasions. Although Father always bore the brunt of the violence, the testimony, which even Mother acknowledged, was that Mother frequently provoked the outbursts because of her alcoholism and drug abuse.

While the couple were living together, Mother became pregnant with Taylor, who was born during this period. Mother convinced Father that Taylor was his child and Father had no basis to believe otherwise. After the couple physically separated and Mother moved out, Taylor was left with Father, who alone cared for her and provided for her needs as if she were his own. It was not until Mother returned to retrieve her daughter that Father learned that he was not Taylor's biological father. Father was heartbroken when he learned of this circumstance as he had picked Taylor up from the hospital when she was born, had bonded with her, and had been led by Mother to believe all along that the child was his daughter.

Father testified that after he and Mother broke up he was trying to move on with his life. Because he was aware that Mother was living with another man, he purposely left Mother alone. Sometime during the Christmas season of 1995, Father went to Mother's home in order to drop off Christmas gifts for Taylor. On that occasion, Mother and Father last had sexual relations. The testimony was undisputed that Father used a condom.

Sometime in the next few months, Father heard a rumor from an acquaintance that Mother might be pregnant. It did not occur to him to call Mother or to verify the information by any means. Father had last seen Mother at Christmas, had used birth control during their one sexual encounter, and had never heard from Mother directly. In fact, Father viewed the rumor as merely an effort to hurt him as he was aware that Mother was living with another man. Not only was there no verification of the truth of the rumor, but Father had no reason to suspect that the child was his because he had used birth control on the one occasion that he and Mother had been intimate. Moreover, during this time, Father had no communication from Mother, and he, in turn, did not attempt to contact her. Father assumed that Mother would notify him directly if she were pregnant.

Employees of the Adoption Agency who have been involved with this case were also led to believe that Ronald L. was the child's birth father. When Mary Daily, an agency social worker, first met with Mother, she was advised by Mother that there was no possibility that any other man could be the child's father. Under the circumstances, the Agency did not investigate the matter further.

Gail Boardman of the Agency also corroborated Father's testimony at trial. She acknowledged that, from his first contact with the Agency, Father was focused on obtaining custody of his child and expressed his willingness to do whatever was necessary, including providing support. Ms. Boardman also confirmed that Father did not initially believe that the child was his.

At trial, Father made an impassioned plea for custody of his daughter. He insisted that he can provide financial, physical, and emotional support and that he would be a loving, caring, and nurturing father. Mother also agrees that Father could love and care for the child and even testified that she would not have placed her child with the Agency for adoption if she had known the true identity of the father as this man is capable of fulfilling his parental and custodial responsibilities.

## II. Contention of the Parties

The Agency argues that from the moment Father was made aware of Mother's pregnancy—albeit through rumor—he had an affirmative obligation to make further inquiry into the possibility that he might have fathered a child, and that he then had the duty to protect his parental rights by investigating the facts and acting appropriately on the information he uncovered. Thus, the Agency submits, even without receipt of formal notice of fatherhood, Father had a duty to discover the facts. It argues that his failure to do anything under the circumstances constitutes abandonment, even in the absence of any contact from the mother and even when all other circumstances would have led a reasonable person to assume, as Father did, that he was not the unborn's parent.

Father, on the other hand, argues that it was neither appropriate nor reasonable to expect him to investigate the rumor of Mother's pregnancy when he had had intercourse with her only one time in the past year and had used birth control on that occasion. Moreover, Father points out that Mother was already residing with another man at the time he heard the rumor. He had had no contact with her whatsoever, and thus he had no indication from Mother that he was the father. In light of the disappointing experience that he had endured with respect to Mother's older child—where Father was led to believe he was Taylor's father when he was not—Father's ultimate reliance on the certainty of blood test results was clearly appropriate. Father contends that abandonment requires a settled purpose to forego all parental duties and to relinquish all parental claims to a child, which simply cannot be established in the absence of a knowledge of paternity. Father's position, succinctly stated, is that, absent his knowledge and intent, the Agency simply cannot prove that he has abandoned this child.

## III. Analysis

The Courts of this State have long recognized that parental rights are fundamental liberties that arise from a natural relationship. In the absence of the most compelling reasons, the Courts may not sever these parental ties. *In the Interest of Kelly Stevens,* Del.Supr., 652 A.2d 18, 24 (1995); *In Re Burns,* Del.Supr., 519 A.2d 638, 645 (1986); *Daber v. Division of Child Protective Services,* Del.Supr., 470 A.2d 723, 726 (1983). In Delaware, the statutory standard for termination requires both proof of an enumerated statutory ground and a finding that termination of one's parental rights would be in the best interests of the child. 13 *Del.C.* § 1103(a)(2). In recognition of the fundamental quality of the parental right, the Delaware Supreme Court has consistently held that termination will occur only upon a showing, "by clear and convincing evidence, that the parent is unable to meet the statute's guidelines." *In Re Hanks,* Del.Supr., 553 A.2d 1171, 1178 (1989); *See also, In the Interest of Kelly Stevens,* 652 A.2d at 23; *Black v. Gray,* 540 A.2d at 433; *Daber v. Division of Child Protective Services,* 470 A.2d at 726. This standard of proof—clear and convincing evidence—requires greater certainty about the factual conclusions necessary to satisfy due process than a preponderance of the evidence standard, thereby emphasizing the fundamental liberty interest at stake and the unique type of deprivation that may occur. *Patricia A.F. v. James R.F.,* Del.Supr., 451 A.2d 830, 831 (1982).

■ In this case, the Agency relies upon its claim of abandonment as the statutory ground for termination. 13 *Del.C.* § 1103(a)(3)[1]. Abandonment is defined in Section 1101(1) of Title 13 as:

> referring to any child who, for a period of six months, or any infant who, for a period of 90 days, has not received any regular and reasonable financial help from his parent or parents ... and on whose behalf no substantial contacts have been initiated by his parent or parents ... during that period.

In addition to the statutory requirement for abandonment, the parent must also demonstrate a "settled purpose" to abandon the child with a present and continuing intent to surrender all further parental claims to the child. *Black v. Gray*, 540 A.2d 431, 433 (1988) (citing *Cline v. Hartzler*, Del.Supr., 227 A.2d 210, 212 (1967)). In determining such intent, Courts must "view evidence not only of subjective intent, but of conduct as well." *Id.* The Family Court thus must weigh the objective conduct of a parent whose rights are sought to be terminated against mere expressions of desire or regret in determining a settled purpose to forego parental duties. *In Re Kline*, Del. Orph., 8 A.2d 505 (1939).

■ Under the Delaware statutory scheme, whether termination is in the best interests of a child can be considered by the Court only after there has been a finding of one of the statutory grounds set forth in 13 *Del.C.* § 1103. *In Re Hanks*, 553 A.2d at 1179; *Black v. Gray*, 540 A.2d at 434; *Daber v. Child Protective Services*, 470 A.2d at 728. For example, in a recent case with far more compelling facts, where a child had been in an adoptive home for eight years at the time the natural father opposed termination of his parental rights, the Delaware Supreme Court rejected the "best interests" standard as an exclusive basis for termination of parental rights, and emphasized that "adherence to established statutory standards for determin-

ing unfitness is a *sine qua non* in any effort to extinguish parental rights." *In the Interest of Kelly Stevens*, 652 A.2d at 26.

■ In the case at bar, the evidence falls far short of establishing that Father has abandoned this child, or that he has demonstrated, either subjectively or through his conduct, a settled purpose to surrender all further parental claims to her. Not only is the evidence of abandonment neither clear nor convincing, but Father's actions since learning of his daughter and of his identity as her father have demonstrated a willingness to accept parental responsibilities rather than to neglect them. In all respects his behavior has been consistent with his stated desire to establish a familial relationship with his daughter and to support her physically, financially, and emotionally. Considering the unique factual circumstances of this case, the Agency has failed to establish any intent at all on the part of Father to abandon his daughter.

In the first place, Father was not even aware of these proceedings, or even that Mother had given birth until sometime in either September or October 1997, when he was first contacted by the Agency with the request that he relinquish his parental rights. That request followed a belated disclosure by Mother of Father's identity as the baby's father, after she had previously named Ronald L., and only after Mr. L. was excluded by blood testing. Mother's pregnancy resulted from a single encounter with Father and both parents testified that they were certain that they used birth control. While the couple had lived together previously, this single act of sexual intercourse occurred during a period of time when the parties were no longer seeing each other and when Mother was living with a different man. In fact, the parents never saw each other again.

Father refused the Agency's suggestion to relinquish his parental rights and sought im-

1. The pertinent provisions of 13 *Del.C.* § 1103 are:
   (a) The procedure for termination of parental rights for the purpose of adoption or, if a suitable adoption plan cannot be effected, for the purpose of providing for the care of the child by some other plan which may or may not contemplate the continued possibility of eventual adoption, may be initiated whenever it appears to be in the child's interest and that 1 or more of the following grounds exist:
   (2) The child has been abandoned; or...

mediate blood testing so that he could know his status with certainty. This desire to establish paternity for a fact stems from his unfortunate experience with Taylor, whom he believed to be his child for many months, but only later learned she was not. His decision to seek visitation rights only after the test confirmed his paternity was also understandable in light of the disappointment he felt when the truth about his relationship with Taylor had been revealed.

The Agency further urges this Court to find abandonment sufficient to satisfy the statutory standard based upon Father's failure to assert and protect his rights beginning at the time the pregnancy became known. In other words, it is suggested that Father should have acted to assert his parental rights immediately when he heard the rumor that Mother might be pregnant, even though he had no indication from her that he was the father and even though she was living with another man at the time. This, of course, is totally unrealistic as it would require a potential father to become involved in the pregnancy on the "mere speculation that he might be the father because he was one of the men having sexual relations with her at the time in question." *In the Interest of B.G.C.*, Iowa Supr., 496 N.W.2d 239, 241 (1992). Such a standard would also require men to force continued contact with a woman with whom they are no longer involved. Moreover, it appears to overlook any interest the woman might have in preserving her own privacy once the relationship is over. *Robert O. v. Russell K.*, 80 N.Y.2d 254, 590 N.Y.S.2d 37, 604 N.E.2d 99, 106 (1992) (Tittone, J., concurring).

In my judgment, Father cannot be subjected to a termination of his parental rights for acts or omissions prior to mid-January of 1998, because he had no knowledge of where Mother was during the prenatal period, he was not informed when the child was born, and Mother concealed from him the fact of the child's birth. Not only did Mother not inform him that he was the father but she believed it to be another person and actually identified that individual to the Agency, who first named him in this termination petition. Moreover, there was no evidence suggesting

Father had any means of learning the facts, short of blood testing. Even if Mother had been aware of the true father—which she apparently was not—Father would not have been able to trust her word at face value, given his experience with Taylor. Mother's conduct, whether intentional or otherwise, frustrated any possibility for Father to learn of his parental obligation. Moreover, while the Agency is quick to point to Father's inaction, it did not even begin to identify just what it is that Father might have done to fulfill his responsibilities in these circumstances. Since Father had neither the knowledge of the child's existence nor the means to acquire that knowledge, his failure to act during any period before January 1998 cannot constitute proof of abandonment.

Father's actions demonstrated precisely the opposite intent with respect to his daughter. In fact, he has vigorously asserted his parental rights. As soon as he was advised by the Agency that he was potentially the father of this child, he took immediate and appropriate action. He contacted the Agency promptly and refused to relinquish his parental rights. He requested paternity testing as soon as possible and obtained counsel to represent him in the termination action. During his first meeting with the Agency social worker, he offered to pay child support and as soon as he learned the results of the paternity test, through counsel, he promptly requested visitation. At trial, he appeared, testified, and resisted the efforts of the Agency to deprive him of his parental status. He expressed a sincere and genuine desire to raise his daughter and to provide for all of her needs. These are not the actions of one who has an intent to abandon but those of a father who fully desires to accept and fulfill his parental responsibilities.

In support of its contention that Father has abandoned the child, the Agency relies on several decisions from Delaware and other jurisdictions. In so doing, the Agency maintains that Father had enough notice of the real possibility that he was the father to require, at the least, further inquiry. While these cases all involved, as in this instance, a belated assertion of parental rights by a biological father, and vigorous defenses against

efforts to terminate those rights, they are each factually distinguishable from the case at bar.

In the most recent Delaware case, *In the Interest of Kelly Stevens,* 652 A.2d 18 (1995), for example, our State Supreme Court reiterated that a "settled purpose" to abandon must be proven to terminate parental rights on the ground of abandonment but found, under the unique facts of that case, that the fact had demonstrated such an intent. After the father in *Kelly Stevens* had spent approximately seven years in litigation concerning the custody of his daughter (sometimes over such non-substantive issues as jurisdiction), he failed to appear for a visitation hearing. The visitation petition was therefore dismissed and the father did not appeal. The Supreme Court found that the father's conduct revealed that he was more interested in litigating than he was in parenting. Since the father had failed to initiate any contact with his child other than the litigation, the Court held that he was not litigating in good faith.

In the instant case, Father has been aware of the results of his paternity test for less than two months, his efforts to establish a relationship with his child are genuine and sincere, and there is no evidence to suggest that his position in this termination case is asserted for anything but the most proper motives. The facts of the *Kelly Stevens* case were strikingly different in ways that were significant and central to that decision.

Similarly, the case of *In the Matter of Karen A.B.,* Del. Supr., 513 A.2d 770 (1986) which the Agency claims supports its position, is inapposite to the case at bar. In *Karen A.B.,* the Delaware Supreme Court held that an unwed father did not have a constitutional due process liberty interest or a right to notice of proceedings for the termination of his parental rights. In that case, the mother had consented to termination and adoption and had exercised her statutory option to withhold the father's identity. The issues in the case at bar are different because Father did receive notice of this proceeding and thus there is no claim of a denial of due process. Here, the sole question is whether the Agency has proven abandonment under 13 *Del.C.* § 1103(a)(2).[2]

In summary then, this Court concludes that the Agency has failed to prove by clear and convincing evidence that Father abandoned his daughter pursuant to 13 *Del.C.* § 1103(a)(2). In the absence of a finding of abandonment, the Court cannot consider the "best interests of the child", no matter how tempting it may be to resolve this emotional issue by avoiding disruption of the child's placement. Indeed, while the Court is mindful of the loss that will result to the adopting parents, and of the adjustment it will require on the part of the child, under our statutory scheme, the Court is not free to take a child from her natural parents simply by deciding that another home offers more advantages, or even more security.

Indeed, in *Kelly Stevens,* a case where the facts were far more compelling than the facts here, since the child there had been with her pre-adoptive foster family for more than eight years, the Court was nevertheless constrained to avoid deciding the case solely by application of the best interests standard. In so doing, the Delaware Supreme Court observed as follows:

> Application of a best interest of the child standard without a determination of unfitness carries the dangerous potential of placing the welfare of the child over the legitimate familial interests of parents who

---

2. The Agency also relies upon several cases from other jurisdictions to support its position. *Adoption of Michael H.,* 10 Cal.4th 1043, 43 Cal. Rptr.2d 445, 898 P.2d 891 (1995), *In the Matter of the Appeal in Maricopa County Juvenile Action No. JS–8490,* 179 Ariz. 102, 876 P.2d 1137 (1994) and *In the Matter of Baby Boy S.,* 22 Kan.App.2d 119, 912 P.2d 761 (1996) are all factually distinguishable from the present case, and *Michael H.* was decided under a very different statutory scheme for adoption from the one found in Delaware. In addition, in *Juvenile Action No. JS–8490,* the father had reasonable grounds to know that he had fathered the child but did not make further inquiry or take any action to gain custody until almost a year after he was told by the mother that the child was his. Lastly, the case of *Baby Boy S.* is distinguishable because the father knew unquestionably during the time of the mother's pregnancy that he was the father but made no effort to follow up on the situation after the couple broke up approximately four months before the child's birth.

have sought to assert their parental rights in good faith. Our society daily witnesses children in deprived situations, attributable to the economic or cultural disadvantages of their custodial parents, who would clearly benefit from placement with, and adoption by, individuals who would give them a higher level of material and emotional support. A transfer of parental rights in such settings may well advance the best interest of a particular child but the law does not sanction such a change without compliance with statutory standards. *See, In the Interest of B.G.C.*, Iowa Supr., 496 N.W.2d 239, 245 (1992) ("statutory grounds for termination must be established in addition to establishing the child's best interests in order to terminate"); *Matter of Baby M.*, 109 N.J. 396, 537 A.2d 1227, 1252 (1988) ("It has long been decided that the mere fact that a child would be better off with one set of parents than with another is an insufficient basis for terminating the natural parent's rights."). 652 A.2d at 19–20.

Thus, even in a case where there was the potential for tragic disruption of a far longer placement, and where the removal of the child from her foster home could have led to profound hardship, the Delaware Supreme Court nevertheless required clear and convincing evidence of parental unfitness as a prerequisite to forfeiture of the parental right.

Similarly, since the child in the case at bar has been living with her foster parents for a year and a half, the impact of this decision will necessarily mean depriving her of the stability of an ongoing relationship with her adopting parents. The importance of finality in the lives of children, however, cannot, under the facts of this case, justify circumscribing the competing constitutional rights of her biological parents.

## IV. Conclusion

Accordingly, for all of the foregoing reasons, the petition for termination of parental rights is hereby dismissed.

Dismissal of the Agency's termination of parental rights petition does not end the responsibility of either of the parties or the Court in this case. Mother's act of surrendering her rights and in giving physical custody of the child to the Agency was sufficient to invoke the jurisdiction of the Court, and the child's future welfare remains a legitimate concern of the Family Court, regardless of the dismissal of this action. The Court therefore directs the parties to determine how best to effectuate the transfer of the child to her natural father's care and custody, including the manner in which Father should be gradually introduced into her life, the role that prospective adopting parents should play in that process, and any other counselling or therapy that may be required to facilitate the child's transfer by the least disruptive means. The parties are to provide the Court with a stipulated plan within ten days from the date of this Order.

**IT IS SO ORDERED.**